## GLOVER PACKING COMPANY OF TEXAS

v.

## The UNITED STATES.

### No. 187–61.

United States Court of Claims.

Feb. 14, 1964.

Arthur Glover, Amarillo, Tex., for plaintiff.

Thomas A. Troyer, Denver, Colo., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

This is a suit for the refund of income taxes based on plaintiff's claim that it is entitled to deduct from its 1957 income losses sustained in prior years. It is entitled to do so unless section 382(a) of the Internal Revenue Code of 1954 [1] pro-

1. Section 382 of the Internal Revenue Code of 1954 provides, in part:
"§ 382. Special limitations on net operating loss carryovers
"(a) *Purchase of a corporation and change in its trade or business.—*

"(1) *In general.*—If, at the end of a taxable year of a corporation—
"(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corpora-

hibits it. So far as this case is concerned that section provides that if the person who owned the greatest percentage of the market value of plaintiff's stock at the end of 1957 had acquired it by purchase during the current year or the prior year, and if the kind of business carried on by the corporation changed after such acquisition, then the deduction is prohibited.

Plaintiff, a Texas corporation, was organized in September 1950 to carry on a slaughterhouse and meat-packing business.[2] During the following year, it completed construction of a slaughterhouse in the City of Amarillo. In October of 1951, plaintiff began active operations. To raise working capital, it borrowed $500,000 from two banks. Most of its principal shareholders personally guaranteed the loans.

From the start, plaintiff's business was unsuccessful. In May 1952, having incurred large operating losses, it ceased actively to operate the abattoir, purchased no more animals for slaughter, sold off its inventory of meat, and reduced its staff to a single maintenance employee. Thereafter, until January of 1957, plaintiff did not resume the slaughterhouse business. In the meantime plaintiff undertook to locate a new manager for the business. Failing in that, it sought to lease the abattoir or to sell the business or its assets upon terms which would relieve the shareholders of their heavy personal liabilities.

tion which is at least 50 percentage points more than such person or persons owned at—

"(i) the beginning of such taxable year, or

"(ii) the beginning of the prior taxable year,

"(B) the increase in percentage points at the end of such taxable year is attributable to—

"(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

"(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

"(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

"(2) *Description of person or persons.*—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock.

"(3) *Attribution of ownership.*—Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that section 318(a) (2) (C) shall be applied without regard to the 50 percent limitation contained therein.

"(4) *Definition of purchase.*—For purposes of this subsection, the term 'purchase' means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3)."

&ast; &ast; &ast; &ast;

"(c) *Definition of stock.*—For purposes of this section, 'stock' means all shares except nonvoting stock which is limited and preferred as to dividends."

2. From the date of its organization until 1957, plaintiff's name was Tri-State Pack-

For a 4-month period, from April 1, 1953 to July 31, 1953, the building was leased to the Air Force for food storage. During the last few months of that year, it was rented by a local slaughterer. In 1954, plaintiff negotiated a long-term lease of the building to Rath Meat Packing Co., a large meat-packer. The lease ran for 16 months from September 1, 1954, and it was subsequently extended to December 31, 1956. Under the terms of the lease, Rath was given the option to purchase the plaintiff, either by buying the 5,000 outstanding shares of stock at $100 per share or by paying $500,000 for all of the corporate assets. Plaintiff gave Rath a relatively low rental in the hope that the lessee would find it financially attractive to exercise its option. But Rath chose not to purchase the corporation, and it surrendered the building in December of 1956.

When plaintiff's stockholders learned that Rath would neither renew its lease nor purchase the corporation, they claimed and were allowed deductions on their 1956 income tax returns for the worthlessness of their stock.

After the expiration of the Rath lease, the shareholders entered into negotiations for the sale of plaintiff to an experienced meat-packer by the name of Homer F. Glover.[3] Glover was the owner and operator of a slaughtering and meat-packing business in Roswell, New Mexico. Previously, in 1952, the shareholders had tried to induce him to operate plaintiff in the position of General Manager, but the parties could not agree on terms. The later negotiations were more successful, and Glover undertook to purchase the plaintiff.

He addressed to plaintiff's shareholders a memorandum setting out the terms upon which he was willing to purchase a portion of their stock. He proposed to operate the packing plant and to pay off the corporate indebtedness, if he were given full control over plaintiff's operations and eventual ownership of all of plaintiff's stock. In conclusion he said that the sale must be made in a way that would comply with section 382, which he understood would permit plaintiff to carry over its tax losses incurred in prior years and thereby give it a period of tax-free operation.

These negotiations bore fruit in a document entitled a "Sales Agreement" which was dated January 1, 1957, but was executed in February, by Glover, plaintiff, and plaintiff's principal shareholders and guarantors. The agreement, which is set out in full in finding 23, provided that Glover would immediately receive 10 percent of the corporation's outstanding stock. In return, he would immediately discharge 10 percent of the corporate indebtedness. The remainder of the stock would be placed in escrow. The corporation agreed to liquidate one-seventh of the remaining indebtedness in each of the succeeding 7 years, in return for which the escrow agent would, each year, transfer one-seventh of the stock in its hands to the corporate treasury. Thus, it was anticipated that, at the end of the 7-year period, Glover would own all of the outstanding stock, the remaining 90 percent having become treasury stock. At the end of that period, the corporate debt would be eliminated, and the guarantors would be free of their liabilities.

It was agreed that Glover would immediately assume full management of the corporation. He was also given the right to nominate the directors for whom the escrowed stock would be voted. Glover, in turn, promised to declare no dividends and to limit salaries to himself and his

---

ing Company. The name was changed by the new owners in 1957.

3. As a matter of fact, Glover acted on behalf of himself and two associates who received one-half of the shares that the former stockholders gave up. It appears from the record, however, that Glover was the prime mover on the side of the new owners and the person directly responsible for plaintiff's operations after the acquisition. His name will be used to refer to the purchasers of the corporation's stock.

nominees to a total of $3,000 per year during the term of the contract.

As contemplated by the sales agreement, the shareholders made an escrow arrangement with a local bank under which all of the shares in the corporation left in their hands were endorsed in blank and given to the bank. The bank agreed to vote the stock and deliver it in accord with the purposes of the sales agreement.

In January 1957, Glover took over the active management of the plaintiff and resumed slaughterhouse operations in its building. He and his nominees were elected a majority of the officers and directors. Glover received 10 percent of the stock. Pursuant to a supplementary agreement with the shareholders, he did not immediately liquidate 10 percent of the indebtedness, as had been agreed, but instead contributed between $30,000 and $35,000 to plaintiff's working capital. In all other respects, the agreement went into full effect.

Glover integrated plaintiff's operations with those of his New Mexico meat-packing business. Under his management, plaintiff thrived. During 1957, the first year that Glover was in control, plaintiff had a net income of $77,486.51. Its losses during the preceding 5 years had totaled $559,199.78. Plaintiff claimed the right, under section 172 of the Internal Revenue Code, to carry forward an amount of the loss sufficient to offset this income; it thereby would have no tax liability at all for 1957. Relying upon the prohibition against loss carryovers contained in section 382(a), defendant disallowed the deduction. Plaintiff paid the resultant $34,792.79 deficiency and filed a timely claim for a refund. The claim was denied, and this suit followed.

Since Glover owned no stock at the beginning of 1957 or 1956, the first question is whether he owned 50 percent of the market value of the "outstanding stock" at the end of 1957. If he did, plaintiff falls within the first requirement of section 382(a).

Glover purchased in February 1957 only 10 percent of the stock outstanding at that time, but the sales agreement provided that the remainder of the stock would be endorsed in blank and put in escrow. During this time no dividends were to be paid on it and it was to be voted only by the escrow agent, and by the escrow agent only as Glover should direct. Over a period of seven years, one-seventh of the stock was to be turned into the treasury of the company each year and was not to be reissued, sold, or hypothecated; provided that the company or Glover each year paid or otherwise relieved the stockholders from liability on a pro rata part of the corporation's indebtedness which had been guaranteed by them. That they would be so relieved was guaranteed by Glover, who assumed personal liability therefor.

■ The result of this agreement was that all of the shares of stock in the corporation, except the 10 percent transferred to Glover, were in what might be called a state of suspended animation during the period of the escrow agreement. They became puppets and the wires that controlled their movements were in the hands of Glover. As the years passed they would gradually go down into the tomb of the treasury. After the agreement had been fully performed, they could in no sense be considered as "outstanding." Pending their demise, while they were in a state of suspended animation, we do not think they can be considered to have been "outstanding," in the sense the word was used in the statute.

■ This is so because the evident purpose of the statute was to prevent the deduction of prior losses by a corporation where control of it had been acquired during the last two years and the character of the business had changed. It was control with which Congress was concerned. That is the reason the increase in percentage of stock ownership was fixed by statute at 50 percent. So, when Congress spoke of an acquisition of 50 percent of the "outstanding" stock

and its ownership at the end of the taxable year, it had in mind stock that gave control of the corporation.

This is evident from the fact that an increase of 50 percent in the purchaser's holdings might be brought about by a decrease in the outstanding stock. Indeed, that is just what happened in this case: All the stock not owned by Glover was put in a state of innocuous desuetude; it was rendered powerless to interfere with the control Glover demanded as consideration for his agreement to liquidate the indebtedness of the corporation.

This is further evident from the fact that section 382(c) provides that "For purposes of this section, 'stock' means all shares except *nonvoting* stock which is limited and preferred as to dividends." [Emphasis added.] Preferred stock was not to be excluded from consideration if it had voting rights. If it had such rights it entered into control of the corporation. If it had none, it had no effect on control and, hence, was disregarded.

No matter how many shares Glover actually possessed, there is no doubt that, after the 1957 agreement went into effect, he obtained sole and absolute control over plaintiff's fortunes. The fact that his ostensible ownership was limited to a small number of shares is immaterial; for the question which the statute asks is not, who owned the largest number of shares, but, rather, who owned the stock that had the greatest market value. Since the 1957 agreement stripped the escrowed stock of the incidents which create value,[4] it follows that the shares that came into Glover's hands constituted a majority of the value of the outstanding stock. Looking to the substance of the transaction and its after-effects, it is clear that this was the case.

We now come to the final and the most troublesome issue in this case: whether plaintiff has failed to comply with the continuity-of-business test set up by subparagraph (1) (C) of section 382(a). Under that provision, plaintiff, even though it has undergone a change in ownership by a purchase of a majority of the value of its shares, is still entitled to deduct its operating loss carryover unless it "has not continued to carry on a trade or business substantially the same as that conducted before any change" in the ownership of its stock. The parties agree that this is so.

■ The slaughterhouse and meatpacking enterprise which plaintiff conducted, after the Glover acquisition, was in substance the same operation as it carried on between October 1951, when its plant was completed, and May 1952, when it ceased to operate an abattoir. The changes that Glover instituted necessary to integrate plaintiff's business with that of his New Mexico meat-packing plant would not, standing alone, be sufficient to bring plaintiff within the terms of subparagraph (C). See Goodwyn Crockery Co., 37 T.C. 355 (1961), aff'd, 315 F.2d 110 (6th Cir. 1963). But after the cessation of operations in May of 1952 plaintiff did not actively engage in the slaughterhouse business until after nearly 5 years had passed. During the interval, it bought no animals, dressed no carcasses, and, with the exception of an inventory liquidation, sold no meat. It had no operating employees, and completely discontinued the operation of an abattoir. During the 5-year period its activities consisted of leasing its plant to the Air Force, earning $29,865.58 in rent, and to a local slaughterer, who paid a rental that was barely sufficient to cover utility costs during his term, and the leasing of the building to a large meatpacker for something over two years, for a total of $64,833.33 in rent. Plaintiff's sole business during the period of four

4. During the time the stock was in escrow and in the treasury of the company, no dividends could be paid on it, and it could not be sold or hypothecated, and, hence, it had no value, except to Glover. It had only the potential value of a resumption of control of the corporation by the original stockholders upon a default by Glover in the performance of his agreement. In case of default by Glover, it certainly had no value.

or five years prior to Glover's acquisition was the leasing of its building.

Plaintiff says that these rental activities never were or could have been profitable, that they were merely makeshift activities until it could get its slaughterhouse going again; it says that the losses it seeks to offset against its income from slaughterhouse operations were also incurred in the slaughterhouse operations. To permit such an offset in the circumstances, plaintiff argues, would not violate the fundamental policy behind subparagraph (C), to prohibit losses from one type of business from being deducted from gains in a different type of business.

This presents a problem not easy of resolution. The subsection reads, "[S]uch corporation has not continued to carry on a trade or business substantially the same as that conducted before any change * * *" in ownership. This seems to convey the idea of continuous operation, without any substantial break. It hardly envisages the resumption of an operation carried on in the distant past, with intervening operations of a different kind. Nor does it envisage the resuscitation of a business long since discontinued. Does it mean one discontinued four or five years previously?

That some break is tolerable seems to be indicated by the legislative history. When section 382(a) was originally drafted and passed by the House of Representatives, it did not contain a continuity-of-business test. Subparagraph (C) in its present form was added to the section by the Senate Finance Committee. The Committee Report explained the additional provision as follows:

> "It provides that if the corporation has not continued to carry on a trade or business substantially the same as that conducted *immediately* before any change in the percentage ownership of the fair market value of the stock, the condition in subparagraph (C) is met." S.Rept. No. 1622, 83d Cong., 2d Sess. 285, 3 U.S.

Code Cong. & Adm.News (1954), p. 4923. [Emphasis added.]

However, when the Conference Committee reported out the section, including the Senate amendment, its report omitted the use of the word "immediately." See H.R.Rept. No. 2543, 83 Cong., 2d Sess. 19, 3 U.S.Code Cong. & Adm.News (1954), p. 5299.

The Treasury Department recognizes that some break is tolerable under some circumstances. Example (2) under section 1.382(a)–1(h) (6) of the Treasury Regulations deals with the case of a corporate taxpayer whose plant is destroyed by fire shortly before the purchase of all of its stock. The resultant suspension of business does not bring the corporation within subparagraph (C). The example states that "the fact that the corporation's normal activities are temporarily suspended at the time of an increase in ownership does not of itself constitute a failure to carry on a trade or business substantially the same as that conducted before the increase in stock ownership."

█ It would seem that a break of a temporary nature does not destroy the continuity required by the statute. But here the hiatus was between 4 and 5 years. This is quite different from what the Senate Finance Committee had in mind when it used the word "immediately." Could the conferees have intended a discontinuance of operations for 4 or 5 years?

In the case at bar there was not a mere temporary suspension of operations. It was a discontinuance of them, without any firm purpose to resume them in the future. For a year or two the corporation was on the lookout for a man who knew how to run a slaughterhouse, and if one had been found it would probably have resumed operations; but this effort was abandoned after awhile, and then it tried to find a purchaser. When the Rath Company decided it did not want to buy plaintiff's property or to buy the stockholders' shares, the stockholders gave up, and charged off their stock as worthless. This was evidence of an in-

tention to abandon the enterprise as hopeless. A resumption of it later could hardly be called a continuation of it.

Glover's appearance on the scene and the subsequent agreement with him was not the continuation of an old enterprise, but the inauguration of a new one, although of the same or similar kind. The old enterprise died in May 1952. It was not a going business in 1957, when Glover acquired his stock. It had not been resumed before he acquired it. Operations under Glover cannot be considered a continuation of the business that had been discontinued in May 1952. It was the inauguration of a new business of the same kind.

What authorities there are support this view.

Treasury Regulations, Section 1.382 (a)-1(h) (6) (1962) read as follows:

"(6) A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership. * * * "

Rev.Rul. 58-9, 1958 Cum.Bull. 190 is to the same effect.

In Cohen, Phillips, Surrey, Tarleau, and Warren, The Internal Revenue Code of 1954; Carryovers and the Accumulated Earnings Tax, 10 Tax L.Rev. 277, 285 (1954-55), the authors adopt the view that this subsection "looks to the continuity of an enterprise." See also, Bittker, Federal Income Taxation of Corporations and Shareholders, 63, 64 (1959 ed.).

The Tax Court expressed the same opinion in Fawn Fashions, Inc., 41 T.C. No. 23 (Nov. 15, 1963) (alternative holding).

Upon careful consideration of the purpose of Congress and the means by which Congress sought to accomplish that purpose, we think it must be concluded that the enterprise after Glover came into it in 1957 was not a continuation of the enterprise discontinued in 1952. Section 382(a) was intended to prevent "trafficking in corporations with operating loss carryovers." H.R.Rep. No.1337, 83d Cong.2d Sess. 42 (1954), 3 U.S.Code Cong. & Adm.News (1954), p. 4067. Under section 129 of the 1939 Internal Revenue Code, which was added by the Revenue Act of 1943, 58 Stat. 21, 47 (1944), a newly-acquired corporation was prohibited from deducting operating loss carryovers where the principal purpose of the acquisition was to use the losses to evade or avoid the payment of income taxes. Because corporate acquisitions were, and continue to be, made from a complex variety of economic motives, the test of section 129 created virtually insurmountable difficulties of limning the state of mind of the parties to the transfer and, therefore, proved unworkable in practice. For this reason Congress, in enacting section 382(a), abandoned any attempt to discern the purpose behind such a change in ownership and created a mechanical standard for determining the circumstances in which the loss carryover would be unavailable, but the purpose was to prevent the buying of corporations in order to take advantage of their prior losses. Plaintiff cannot do so because the business after Glover's acquisition of it was not a continuation of the former business.

By reason of the foregoing, plaintiff is barred by section 382(a) of the Internal Revenue Code from carrying over a net operating loss to its taxable year 1957. It follows that defendant's deficiency notice properly assessed the correct amount of plaintiff's income tax for that year. Plaintiff is not entitled to recover, and its petition is dismissed.