Utah Bit & Steel, Inc. v. Commissioner.
Utah Bit & Steel, Inc. v. Commissioner
Docket No. 3947-67.
United States Tax Court
T.C. Memo 1970-50; 1970 Tax Ct. Memo LEXIS 309; 29 T.C.M. (CCH) 224; T.C.M. (RIA) 70050; February 26, 1970, filed Allan E. Mecham, for the petitioner. Eugene H. Ciranni, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1963, 1964, and 1965 in the following amounts: Year
Deficiency
1963
$ 4,940.45
1964
3,892.68
1965 4,998.63
Total
$13,831.76
The issues for decision *311 are: (1) Whether under the provisions of section 382, I.R.C. 1954, [1] any net operating losses sustained by petitioner prior to 1963 are not to be included in the net operating loss carryover deductions of petitioner for 1963 and subsequent years because the stock of petitioner was acquired by the present owners thereof while petitioner was in bankruptcy and not actively carrying on a trade or business. (2) If petitioner was actively carrying on a business at the time of acquisition of its stock by the present owners, was their acquisition of that stock for the principal purpose of avoiding Federal income tax by securing the benefit of a net operating loss carryover deduction to which they would have not been otherwise entitled. Findings of Fact Some of the facts have been stipulated and are found accordingly. Utah Bit & Steel, Inc. (hereinafter referred to as petitioner) is in the business of fabrication and renovation of drill steel and drill bits. Its principal place of business at the time the petition in this case was filed was in Midvale, Utah. Petitioner's Federal corporate *312 income tax return for each of the years here in issue was filed with the district director of internal revenue at Salt Lake City, Utah. Petitioner's business consists primarily of repairing and sharpening drill steel and bits which had become dull and ineffective from use in mining. Among petitioner's customers are such major corporations as U.S. Steel Corporation, Anaconda, Kennecott Copper Corporation, and Columbia-Geneva Steel. Petitioner was organized as a Utah corporation on December 5, 1946, by Sherman Johnson (hereinafter referred to as Johnson). Johnson, his wife, Hazel Dorothy Johnson (hereinafter referred to as Hazel), and other members of his family controlled petitioner and owned a majority of its stock from the time it was organized until June 25, 1962. Johnson was originally an assayer and geologist and later became a business promoter. Until the first of 1958 petitioner serviced all of the mining and construction industry located in the area surrounding Midvale, Utah. Customers seeking steel bit fabrication work must rely upon the services of a local fabricator since freight rates make it economically unsound to haul the equipment in need of repair to distant places *313 in order to have the work done. In 1948 petitioner employed A. M. Ross (hereinafter referred to as Ross) as a blacksmith to fabricate and repair drill bits and drill steel. Ross had many years of experience working as a miner digging for ore and was familiar with the practical problems encountered by miners using drill bits in mining operations. Subsequently, Ross was made a salesman and later the manager of petitioner. In 1957 Ross was made vice president of petitioner. 225 Also in 1948 petitioner employed Richard Cowan (hereinafter referred to as Cowan) as a part-time bookkeeper. In 1954 Johnson moved with his family to Dallas, Texas and Cowan was made a full-time office manager for petitioner. After Johnson moved to Texas more responsibility for the business of petitioner was given to Ross and Cowan. Cowan became the secretary and treasurer of petitioner as well as its office manager. Ross was placed in charge of petitioner and became well known in Utah as a salesman of drill steel and drill bits. When Ross and Cowan first became associated with petitioner in the late 1940's, its average sales were between $200 and $300 per week. By 1957 petitioner's sales averaged *314 in excess of $2,000 per week. During the years 1948 through 1957 Cowan had purchased a 10 percent interest in petitioner and Ross had acquired a 25 percent interest primarily pursuant to his managerial contract. He had also purchased 10 shares from another employee of petitioner. For each of the years 1946 through 1957, petitioner operated at a profit. Johnson died in 1955 and Hazel assumed control of petitioner. Dissension developed between Hazel and Ross and Cowan which resulted in Ross and Cowan resigning as employees and officers of petitioner in March 1957. On March 14, 1957, Ross and Cowan along with their wives organized in Utah a limited partnership called Ross-Cowan Steel and Equipment Company (hereinafter referred to as Ross-Cowan). Ross-Cowan was to do work similar to that done by petitioner as well as engage in buying and selling equipment. Ross and Cowan were the general partners of Ross-Cowan and their wives were limited partners. Each partner was to share equally in the profits and losses of Ross-Cowan. The physical plant and equipment which was acquired by Ross-Cowan had been used by a sole proprietorship which operated under the name of Utah Tractor and Equipment *315 Company. Ross-Cowan acquired the plant and equipment from the estate of the sole proprietor for $8,944.16. The business premises of Ross-Cowan were located directly across the street from the business premises of petitioner. "Steel" was put into the Ross-Cowan name in order to attract former customers of petitioner who the partners believed would determine from the name of Ross and Cowan and "Steel" that the partnership was in a business similar to that of petitioner. On August 15, 1957 the partnership changed its name to Ross-Cowan Equipment Company, deleting the word "Steel." The affidavit of change of name decited that: the said business is devoted primarily to the buying, selling and renting of farm machinery and equipment and the business is not devoted to the sale of steel. Ross-Cowan was incorporated on December 30, 1958. At the time of trial and for sometime prior thereto Ross, Cowan and Allan E. Mecham (hereinafter referred to as Mecham), an attorney, each owned one-third of the outstanding stock of the Ross-Cowan Corporation. After Ross terminated his employment with petitioner, petitioner sued Ross in the District Court of Salt Lake County, State of Utah, for *316 overpayment of bonus and a loan totaling $1,245.47. Ross answered and counterclaimed for $7,500 of unpaid bonuses, $3,000 of unpaid dividends, and $892 for several other items. On August 15, 1958, petitioner and Ross and Cowan entered into an agreement whereby Ross and Cowan sold to petitioner their total stock holdings of 32,727 shares of the 75,000 outstanding shares of stock of petitioner, Ross relinquished the claims he had asserted against petitioner, and petitioner relinquished its claims against Ross. Petitioner agreed to pay Ross and Cowan $22,500 with $5,000 in cash at the time the agreement was signed and $17,500 by a promissory note, guaranteed by Hazel, which provided for payments of $300 per month commencing October 1, 1958, with 6 percent per annum interest until the note was paid. The note did not provide for acceleration in the event of a default by the purchaser. Ross and Cowan each reported the sale of his stock in petitioner on his 1958 income tax return and reported the gain derived from the sale under the installment method. After Ross-Cowan commenced operations across the street from petitioner, customers of petitioner would come over to see Ross and Cowan *317 and express dissatisfaction with the work being done for them by petitioner. Ross-Cowan was not equipped to do repair work and therefore Ross and Cowan decided to organize a corporation to do this type of work. In December 1957 Ross and Cowan had the opportunity to lease a bit and steel shop in Eureka, Utah which would be suitable for doing repair work on drill steel and drill bits. 226 On December 15, 1957, Ross, Cowan and Mecham organized Amco Steel, Inc. (hereinafter referred to as Amco) located at Eureka, Utah. This corporation was organized to sell and repair drill steel and drill bits and to sell mining and construction equipment to the mining and construction industries. While Eureka is located approximately 90 miles from Midvale, customers of petitioner came to Amco for the services of Ross and Cowan. When persons inquired at Ross-Cowan with respect to repairing and sharpening of drill steel and drill bits, they were directed to Amco. In 1960, the place of business of Amco was moved to Midvale, Utah, about a mile away from the business of petitioner. Amco was operating at its Midvale business premises at the time petitioner went into bankruptcy. During the spring *318 of 1960 Gardner-Denver with whom Amco had a franchise to sell Gardner-Denver tools and equipment, such as compressors, air hammers and drills, requested that the word "equipment" be included in Amco's name. This was done and Amco's new name became "Amco Equipment and Steel Co." Petitioner's business was operated at a loss during the years 1958, 1959, 1960, and the first 8 months of 1961. On September 11, 1961, its premises were closed to the public. For the balance of 1961 and for the entire year 1962 petitioner's business premises remained closed to the public and no operations were conducted thereon. On October 11, 1961, petitioner filed a formal petition in bankruptcy in the United States District Court for the District of Utah. Between September 30, 1961, and February 1962, Amco purchased certain of petitioner's machinery and equipment from the trusee and during this period Ross-Cowan purchased from the trustee in bankruptcy all remaining operating assets of petitioner. On January 19, 1962, the trustees in bankruptcy sold for $8,025 to Ross-Cowan, the highest bidder, all items of drill steel, inventory of parts, delivery equipment, office equipment and shop equipment of petitioner. *319 All the assets acquired by Ross-Cowan and Amco were moved to the Amco plant and were immediately put to use by Amco in the conduct of its business, since as soon as petitioner closed its premises, all of its customers came to Amco and the capacity of Amco was not sufficient to properly take care of the increased business. When petitioner went into bankruptcy it defaulted on payments to Ross and Cowan on its $17,500 promissory note. The principal balance at that time was $9,032.09. Ross and Cowan sought to collect the unpaid balance from Hazel, the guarantor of the note. In November 1961 Ross and Cowan filed suit against Hazel to collect the amount due on the note. On January 8, 1962, while this suit was pending, Ross, Cowan, and Mecham held a meeting with respect to organizing a new corporation to service drill steel and drill bits. The minutes of this meeting were as follows: Minutes of a Preliminary Meeting In Re: The Organization of a New Corporation To Service Drill Steel and Drill Bits Chairman:
A. M. Ross
Place:
Midvale, Utah
Time:
3:00 P.M.
Date:
January, 1962 Attendance: A. M. Ross, Richard Cowan and Allan E. Mecham. Attendance: A. M. Ross, Richard *320 Cowan and Allan E. Mecham. 1. The Chairman called the meeting to order at about 3:00 P.M., and stated that the subject for discusison was the organization of a new corporation to service, repair and fabricate drill steel and drill bits, and to deal in any related business. Mr. Ross pointed out that Amco Equipment & Steel, Inc. was organized primarily as a sales company; that there was a conflict in business purpose between the sale and service of parts and the sale of Gardner-Denver equipment and parts. He pointed out that Amco Equipment & Steel, Inc. was the exclusive agent for Gardner-Denver equipment and parts. After considerable discussion, it was concluded that a new corporation should be organized to handle only the sale and service of drill steel and bits, and any related business. 2. Richard Cowan stated that Utah Bit & Steel Company had filed a Petition in Bankruptcy and that we might purchase the corporate entity. 3. A. M. Ross then observed that both he and Richard Cowan had been former employees and stockholders of the Utah Bit & Steel, Inc. and that at the present time the Utah Bit & Steel, Inc. owed to each of them a balance of approximately $9,000.00 on a note, *321 dated August 18, 1958, in which that corporation had agreed to purchase their stock in Utah Bit & Steel. It was also noted that while Mrs. H. D. Johnson had signed the note as a guarantor, it was likely that a substantial portion of the balance due on the note would be lost because of the bankruptcy of the Utah Bit & Steel, Inc. 227 and because of the difficulty of securing payment from Mrs. Johnson. 4. Allan Mecham then reported the status of a law suit which had been filed demanding payment of the balance on said note. He stated that the note could not be accelerated, and the most that could be collected at any one time would be the current month in which it was due, and of necessity several separate law suits would have to be filed in Texas to recover the balance due. In this respect, it appears that Messrs. Ross and Cowan might expect to lose from $5,000.00 to $7,000 on said note. 5. It was then concluded that Messrs. Ross, Cowan and Mecham would negotiate with the stockholders of Utah Bit & Steel to purchase the corporate entity. Allan Mecham was authorized to pursue this matter with the attorney for Utah Bit & Steel, and to report back from time to time of any progress *322 made. By letter to Hazel's attorney dated January 9, 1962, Ross-Cowan made an offer to purchase from Hazel the property on which petitioner's operations had been located for $60,000 plus the unpaid balance of the note. The price was to be paid by $30,000 in cash and $30,000 over a period of 10 years. The letter making the offer which was signed by Cowan as Secretary-Treasurer of Ross-Cowan contains the following statement: We know this is considerably below what she is asking, but our anticipated earnings and limited working capital would not justify a larger investment. The minutes of another special meeting held May 4, 1962, by Ross, Cowan and Mecham to consider further the purchase of the stock of petitioner contain the following statements: At this meeting, Allan E. Mecham reported that he had contacted Glenn C. Hanni, Attorney for Utah Bit & Steel, Inc., and that Mr. Hanni would consider any reasonable offer for the purchase of Utah Bit & Steel, Inc. Mecham was authorized to offer only the amount that Messrs. Ross and Cowan might expect to lose on the outstanding balance due on their note with Utah Bit & Steel, Inc., dated August 18, 1958, and that under no circumstances *323 should a cash offer be made for the purchase of said stock. In May 1962, Hazel gave Ross and Cowan a second mortgage on the land at petitioner's location in the amount of $2,400 representing the sum then due and owing by Hazel on petitioner's promissory note given as part payment for the stock of Ross and Cowan. The first mortgage on the property was to Walker Bank and Trust Company. On June 27, 1962, at a special meeting held by Mecham, Ross, and Cowan the following was recorded as minutes: 1. Allan E. Mecham reported that he had offered to Glenn C. Hanni the sum of $5,000.00, to be offset against the balance on the Ross-Cowan note with Utah Bit & Steel, Inc., dated August 18, 1958, for the purchase of Utah Bit & Steel, Inc. Mecham further stated that Mr. Hanni had proposed a counter-offer of the balance due on the said note, less the $2,400.00 secured by mortgage on real property. Mecham stated that he had agreed to this said counter-proposal, and that the stockholders of Utah Bit & Steel, Inc. had also agreed, and that Mr. Hanni would deliver the stock certificates in exchange for the cancellation of the note of August 18, 1958, and the dismissal of the case of Ross and Cowan *324 v. H. D. Johnson in the District Court of Salt Lake County. 2. Mecham also was authorized to follow through on the legal terms of said purchase as per the agreement with Mr. Hanni. 3. It was then unanimously agreed and voted that Richard Cowan would be President and Director of Utah Bit & Steel, Inc., that A. M. Ross would be Vice-President and Director, and that Allan E. Mecham would be Secretary-Treasurer and Director; that the corporation purpose would be to service, repair and fabricate drill steel, and would continue to operate any of the agency agreements that had not been cancelled by virtue of the bankruptcy proceedings; that the books and records would be carefully reviewed, and that new life would be breathed into this said defunct corporation. 4. It was further agreed that Messrs. Ross, Cowan and Mecham would each hold a one-third (i/3) interest in said Utah Bit & Steel, Inc., and that the stock would be issued accordingly. On July 3, 1962, a meeting of the new directors of petitioner was held. Portions of the minutes of the meeting read as follows: 3. Mecham stated that the following Utah Bit & Steel, Inc. stock certificates had been received, and was all of the *325 outstanding stock of said corporation, to-wit: Certificate No. 19
682 Shares
Certificate No. 20
6,816 Shares
Certificate No. 35
1 Share
Certificate No. 35 34,771 Shares
42,270 Shares 228 He read a letter, dated June 30, 1962, from Glenn C. Hanni, and the letter was made a part of these minutes. It was also suggested that the answer to this letter to be prepared by Allan E. Mecham, would be made a part of the minutes of this meeting. 4. The new officers and directors previously elected June 27, 1962, were unanimously ratified and approved and declared elected. 5. Richard Cowan was authorized to secure the books and records and to commence the operation of this corporation as a service, repair and fabrication of steel bits. He was also authorized to investigate whether or not all of the agency agreements had been cancelled, and for those that had not been cancelled, to try to re-vitalize same. 6. Allan Mecham was authorized to prepare and sign the Oaths of Office. 7. The salaries of the officers of said corporation it was concluded would be fixed at a subsequent date. 8. The bank of deposit was agreed to be Walker Bank & Trust Company of Midvale, *326 Utah. 9. The effective date of the commencement of operation of this said corporation by the new officers noted above is July 1, 1962. The body of the letter of June 30, 1962, to Mecham reads as follows: Pursuant to our telephone conversation and the agreement we made on behalf of our clients, I am enclosing herewith the following stock certificates of Utah Bit & Steel, Inc., all of which have been endorsed: Certificate No. 19 issued to S. W. Johnson, Jr
682 shares
Certificate No. 20 issued to Martha W. Johnson
6,816 shares
Certificate No. 35 issued to H. D. Johnson
1 share
Certificate No. 35 issued to H. D. Johnson 34,771 shares
Total
42,270 shares
You are to return to me the promissory note dated August 18, 1958, from Utah Bit & Steel, Inc., in the face amount of $17,500.00 payable to Richard M. Cowan and Albin M. Ross. The note is to be marked "paid". You are to dismiss with prejudice the action that was commenced on that note. I am enclosing a stipulation and order of dismissal of the action that should be signed by you and returned to me so I can get the order of dismissal signed. It is understood that Mr. Ross and Mr. Cowan have no claims of *327 any kind or nature against Mrs. Johnson other than the $2,400.00 that Mrs. Johnson owes them that will be payable when the property located at 7580 South State Street, Midvale, Utah, is sold. It is further understood that Mrs. Johnson will pay interest on the $2,400.00 at the rate of six per cent per annum from July 1, 1962. If Mr. Ross and Mr. Cowan have any other claims or demands of whatever kind or nature, other than the claim for said $2,400.00, they do, by accepting the stock, release Mrs. Johnson from any liability she may have by reason of any such claims or demands. The Utah Bit & Steel, Inc. neon sign that is on the building will be sold with the real estate. I did tell you that if the buyer of the property when it is sold does not want the Utah Bit and Steel sign, that I would try and persuade him to give it to Ross and Cowan, and in the event that this occurs the interest on the $2,400.00 referred to above will be waived. The books and records of the corporation remain the property of the corporation and will be made available to you. Part of the records are located in the office building at 7580 South State Street. They may remain there until such time as the building *328 is sold without charge to the corporation or to Mr. Ross or Mr. Cowan. In the event access to any of the records of Utah Bit & Steel, Inc., is required by Mrs. Johnson, they will be made available to her. By letter dated July 9, 1962, Mecham advised Glenn Hanni, attorney for Hazel, of the agreement in substance of Ross and Cowan to the conditions respecting the transfer of the stock as set forth in Hanni's letter of June 30, 1962, and made a request for petitioner's tax returns for 1957, 1958, 1959, 1960, and 1961. In addition, Mecham requested the verified audit report and financial statement for the year 1961 as well as the Articles of Incorporation and amendments and bylaws, if there were any. During the subsequent months resignations of previous officers of petitioner were obtained and determinations of any possible legal or accounting claims against petitioner were ascertained. Mail addressed to petitioner was sent to Ross-Cowan. A notice of delinquency in corporate franchise tax dated July 18, 1962, and addressed to petitioner was forwarded to Ross-Cowan and pursuant to the demand in that notice Ross-Cowan paid $12.90 to the State of Utah on September 6, 1962, for petitioner's *329 corporation 229 franchise tax for the year 1961. On July 20, 1962, the trustee in bankruptcy for petitioner was authorized to sell and did sell at $1,000 to Amco a T.R. Air Tract of petitioner. Mecham during July 1962 began investigating whether all creditors of petitioner whose claims would not be discharged in bankruptcy had been paid. Minutes of a meeting of the directors of petitioner dated March 16, 1963, state in part as follows: 2. The purchase of drill steel, bits and other miscellaneous items at Amco's cost was ratified and approved. The purchase of the drill steel, fabricating equipment, and all other equipment used in the repair or fabrication of steel bits and drill steel at Amco's depreciated price was ratified and approved. 3. The operations of the shop, it was agreed, would be part of this operation April 1, 1963. 4. The chairman was then instructed to issue all outstanding stock, which included all stock except stock heretofore unissued. This said stock to be issued to A. M. Ross and Richard M. Cowan in the exact proportion of their interest in their note receivable from Utah Bit & Steel Company, the balance of which in September, 1961 was $7,632.09. It *330 was further understood that A. M. Ross and Richard M. Cowan would then adjust the stock between themselves, and would offer one-third (i/3) of the total stock package to Allan E. Mecham at an agreed price of one-third (i/3) of $7,632.09. It was understood that Richard M. Cowan would also purchase up to one-third of $7,632.09, and that the remaining one-third would be held by A. M. Ross. 5. It was agreed that an equitable contract would be worked out between Amco and Utah Bit & Steel Company, whereby Amco would use Utah Bit & Steel Company for any and all steel bit and drill steel orders received from Amco's present customers. 6. It was agreed that certain employees of Amco would be transferred to the payroll of Utah Bit & Steel Company, and that administrative costs of Utah Bit & Steel Company would be held to a minimum. Minutes of a meeting of the directors of Amco dated March 16, 1963, state in part as follows: 2. Richard Cowan moved that the inventory of drill steel and bits, including M. Points, etc., as of April 1, 1963, be sold to Utah Bit & Steel Company at Amco's cost. This motion was seconded by Allan E. Mecham, and carried unanimously. 3. Allan E. Mecham then moved *331 that all of the shop equipment used in fabricating and repairing drill steel and bits be also transferred to the Utah Bit & Steel Company at the net depreciated base value. This motion was seconded and carried unanimously. 4. It was further agreed that if the depreciated base for selling said equipment to Utah Bit & Steel Company was not the correct base for tax purposes, then Amco would adjust this said base, and that Utah Bit & Steel Company would agree to do likewise. [2]
On April 1, 1963, petitioner reopened its doors for business at the same premises at which it operated prior to the bankruptcy, Ross and Cowan having acquired those premises from Hazel sometime subsequent to January 17, 1963. [3] Petitioner served the same customers and operated the same type of business under the same business name after April 1, 1963, as it had prior to September 11, 1961. It also operated with some of the same employees. Amco ceased the business of repairing and sharpening drills and *332 bits shortly after April 1, 1963, but continued to operate its business of selling equipment and has not merged with petitioner. Amco and petitioner each operated its separate business as a separate entity. On January 28, 1964, petitioner was discharged from bankruptcy and the case was closed on April 21, 1964. The trustee in bankruptcy had collected the accounts receivable of petitioner and maintained a bank account of petitioner. Immediately after Ross-Cowan purchased petitioner's stock, they and Mecham made demands from time to time upon the trustee for a clearance to commence doing business actively as Utah Bit and Steel Company. They subsequently learned that the problem holding up the discharge of the bankrupt was the fact that the demand for fee of the attorney for the trustee and certain accounting fees had to be resolved in order to permit the discharge. Federal income tax returns were filed on behalf of Utah Bit and Steel for the calendar years 1961 and 1962. 230 Petitioner on its 1963 Federal income tax return reported a taxable income before net operating loss and special deductions *333 of $18,454.18. It showed a net operating loss deduction of $90,541.69, which it computed on a schedule attached to the return as follows: *10 SCHEDULE "A" - CALCULATION OF NET OPERATING LOSS DEDUCTION
Amount CarriedForward
1960 Loss 58,612.77
Loss Carried to 1957 9,788.49 $48,824.28
1961 Loss 41,717.41
(1958-1959 & 1960 were loss years)
1962 No Business -0-
(In Bankruptcy)
NET OPERATING LOSS DEDUCTION
$90,541.69
(No Known Exceptions)
On its Federal income tax return for the calendar year 1964 petitioner showed a taxable income before net operating loss deduction and special deductions of $17,693.98 and a net operating loss deduction of $72,087.51 which was computed substantially in the same manner as the net operating loss deduction for 1963 except that the loss carryover was adjusted for the 1963 profit. For the calendar year 1965 petitioner's Federal income tax return showed taxable income before net operating loss and special deductions of $22,645.32 and a net operating loss deduction of $54,393.53 which was computed substantially as was the 1963 net operating loss deduction except that the operating loss was reduced by the 1963 and 1964 *334 profits. Respondent in his notice of deficiency disallowed the claimed net operating loss deductions for each of the years 1963, 1964, and 1965 with the explanation that "* * * it has not been established that the deductions claimed are allowable under Section 382 and Section 269 of the 1954 Internal Revenue Code. * * *" Ultimate Findings of Fact 1. When Ross and Cowan acquired more than 50 percent of petitioner's stock, petitioner was not actively engaged in a trade or business. 2. Ross and Cowan acquired petitioner's stock for the principal purpose of avoiding Federal income tax by securing the benefit of a net operating loss carryover deduction to which they would not have otherwise been entitled. Opinion Section 382(a)[4] provides that when there has been a change in the stock ownership of a corporation of at least 50 percent which is attributable to purchase of such stock, the net operating loss carryover 231 from years prior to the change in ownership shall not be included in the net operating loss deduction for the taxable year in which the increased ownership occurs and subsequent taxable years if the corporation does not continue to *335 carry on a trade or business substantially the same as conducted before such change in ownership. *336 Both parties recognize that Ross and Cowan owned in 1963 and subsequent years 50 percent more stock than they owned at the beginning of 1962 and therefore the condition of section 382(a)(1)(A)(ii) is met. Petitioner makes some argument that Ross and Cowan did not acquire their stock by purchase. The record is clear that Ross and Cowan acquired their stock by exchanging petitioner's note for the stock. Therefore, under the definition of "purchase" contained in section 382(a)(4) their stock was acquired by purchase. Petitioner argues that two of the stockholders who transferred their stock to Ross and Cowan had no interest in the note and therefore must have made a gift of their stock to Ross and Cowan. There is no proof of any gift of stock to Ross and Cowan in the record and the clear inference is that all of petitioner's outstanding stock was purchased for the note. The record is silent as to the arrangement with respect to how the division, if any, of the consideration received for the total stock was made among the sellers of the stock. Since Ross and Cowan exchanged their note for all of petitioner's stock, their basis in the stock is its cost to them which would ordinarily be *337 measured by the fair market value of the note at the time of the exchange. Petitioner argues that at the time of the exchange, the note had no fair market value. The evidence does not support this contention. The note was guaranteed by Hazel and the inference from the record is that it did have some fair market value though not its full amount. The more difficult question with respect to whether the net operating loss is not allowable under section 382(a) is whether after the change in ownership of the stock petitioner "continued to carry on a trade or business substantially the same as that conducted before the change." Section 1.382(a)-1(h)(6), Income Tax Regs., provides that "a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership." [5]
*338 232 In Fawn Fashions, Inc., 41 T.C. 205 (1963), we held this regulation to be a correct interpretation of the statute and supported by its legislative history. This regulation was also cited with approval by the Court of Claims in Glover Packing Company of Texas v. United States, 328 F. 2d 342 (Ct. Cls., 1964). Other cases have discussed this regulation with specific reference to its interpretation as requiring a continuity of the business enterprise so that a temporary as distinguished from a permanent cessation of business does not fall within its ambit. See H. F. Ramsey Co., 43 T.C. 500 (1965), and Clarksdale Rubber Co. 45 T.C. 234 (1965). Our issue here is therefore factual. If we conclude that petitioner had permanently ceased all business operations prior to the purchase of its stock by Ross and Cowan, then it was engaged in no business at the time of the purchase and therefore petitioner could not "continue" to carry on substantially the same "trade or business" carried on by it prior to the purchase. Even though the trade or business carried on by petitioner might be substantially the same as that carried on by *339 petitioner prior to its ceasing carrying on a trade or business, it would not be substantially the same as the total lack of business operations resulting from petitioner's permanently ceasing business before the sale of its stock. See Glover Packing Company of Texas v. United States, supra, at 349. On September 11, 1961, petitioner closed its business to the public after operating at a loss since 1958. Petitioner filed a formal petition in bankruptcy on October 11, 1961. Between September 30, 1961, and February 1962, the trustee in bankruptcy sold to Amco and Ross-Cowan substantially all of the assets of petitioner. These assets were immediately put to use by Amco. The stock of petitioner was purchased by Ross and Cowan in June of 1962 but petitioner did not commence operations until April 1, 1963, approximately 18 months after cessation of business. Petitioner argues that its cessation of business was temporary since its assets were purchased by Ross-Cowan and put to use immediately by Amco so that during the 18 months in which it was not operating its equipment and inventory were being used. We have considered a break in operations of a corporation which was *340 for a reason which would indicate that resumption of operations was reasonably to be anticipated to be a "temporary" ceasing of operations and not a cessation of the conduct of the corporation's regular trade or business. See H.F. Ramsey Co., supra, and Clarksdale Rubber Co., supra. The regulations support the construction that a break in operations of a temporary nature which is not intended to be permanent is not to be considered as "not carrying on an active trade or business." The examples given by the regulations illustrate this principle. One of the examples is of a fire which disrupts the operation until such time as repairs and reconstruction can be accomplished. The other example is of a corporation which suspends its operations and reduces its inventory of finished products because of adverse business and lack of profits. The first example we refer to (Example (2) of Sec. 1.382(a)-1(h)(6), Income Tax Regs.) is given as one in which the suspension is temporary, and the other (Example (1) of Sec. 1.382(a)-1(h)(6)) is one in which the time lapse between cessation of business because of adverse business conditions and the reactivation *341 after change in ownership by purchase of at least 50 percent in value of the outstanding stock is less than a year. Petitioner's cessation of business in September 1961 was because of adverse business conditions. Under the facts here present the filing of a formal petition in bankruptcy the following month shows that petitioner meant the cessation of business to be final. When petitioner was placed into voluntary bankruptcy by its officers, the record indicates that there were no plans to continue its operations. This is shown by the sale of all its assets and the attempt by Hazel to sell the property on which the operation was located. A further indication of lack of intent to continue business operations is the fact that petitioner did not even pay its franchise tax. Corporate income tax returns were filed for petitioner but we do not consider the filing of these returns to be the carrying on of a business. See United States v. Fenix and Scission, Inc., 360 F. 2d 260 (C.A. 10, 1966). In that case a mining corporation, in May 1952, engaged a third party to sell between 80 and 90 percent of its assets. Even though this party was successful in selling only about 10 percent *342 of the company's assets, on August 12, 1953, its board of directors voted to dissolve the corporation and that the corporation transact no further business except to 233 wind up its affairs. The Articles of Dissolution were filed with the State the next month. In October 1955 the corporation rescinded the dissolution resolution and 3 days later sold its stock to unrelated parties who then took steps to reopen the mine. The Court in its Opinion (360 F. 2d at 267-268) stated that the Company was maintaining its equipment and incurring expenses, viz., insurance, taxes, depreciation and wages for two employees and had income from sales and rentals. Certainly the fact that the company was incurring some fixed expenses and filing tax returns doesn't mean it engaged in a trade or business. * * * * * * In any event, Oronogo's attempt to sell nearly all of its equipment is incompatible with the idea that it was merely standing by intending to resume operations should business factors improve. * * * Considering all the facts of record in the instant case, we find no continuation of business by petitioner at the time of the purchase of more than 50 percent of its outstanding *343 stock by Ross and Cowan. Petitioner was not reactiviated until April 1963, almost one year after the purchase of its stock. The acquisition of petitioner's assets by Ross-Cowan was not part of an overall scheme to acquire petitioner's assets and stock, but the decision to purchase the stock came in January 1962 after a substantial portion of petitioner's assets had been purchased by or for use by Amco. Arguments of petitioner that Ross and Cowan had thoughts of buying petitioner's stock soon after petitioner was placed in bankruptcy are unconvincing. Ross and Cowan gave some vague testimony of having such thoughts but their actions in purchasing the assets and using them in the business of Amco and the statements in the minutes of the meeting of Ross, Cowan, and Mecham on January 8, 1962, give a clear indication that the first thought given by Ross and Cowan to the purchase of petitioner's stock was in January 1962 after Amco had already acquired a substantial portion of petitioner's assets. We hold that petitioner was not carrying on any trade or business at the time its stock was purchased by Ross and Cowan. Therefore, we hold, in accordance with section 1.382(a)-1(h)(6) of respondent's *344 regulations and our holding in Fawn Fashions, Inc., supra, that petitioner is not entitled to its claimed loss carryover deductions for the years 1963, 1964, and 1965. Respondent determined that petitioner's claimed net operating loss carryovers are not allowable under section 382 and section 269. While section 382 was apparently enacted to automatically disallow the loss carryover in those cases which fall within its provisions in order to avoid the necessity of the subjective determination of the principal purposes of the acquisition under section 269, the two sections are not mutually exclusive. The loss carryovers may be disallowed under section 269 whether or not they are disallowable under section 382. H.F. Ramsey Co., supra, and Fawn Fashions, Inc., supra.Since we have determined that the loss carryovers in this case are not allowable under section 382, our decision could rest on that determination. However, in our view the evidence is so unmistakably clear that the principal purpose of the acquisition of petitioner's stock by Ross and Cowan was to secure the benefit of the loss carryover deductions of petitioner to which they would *345 otherwise not be entitled, [6] that we feel it more appropriate to determine this issue. At the time Ross and Cowan acquired petitioner's stock they were operating Amco which was engaged in exactly the same business as petitioner had engaged in prior to September 11, 1961. Amco *346 was servicing all of petitioner's former customers. That the success of the business of repairing and sharpening drill steel and drill bits was far more dependent on the skill and reputation of Ross and Cowan than on the name of the company operating the business had been demonstrated by petitioner's success when they were officers and employees of petitioner and its lack of success when they left the company and began competing with it. Amco had all of petitioner's operating 234 assets and all its customers prior to the time Ross and Cowan purchased petitioner's stock. There was no assurance that Ross and Cowan could acquire petitioner's operating location by acquiring its stock since petitioner did not own that property. The only way the operating location could be acquired was from Hazel. All that petitioner had to offer to Ross and Cowan was its operating loss carryovers. Petitioner argues that the principal purposes of Ross and Cowan in acquiring petitioner's stock were (1) to prevent other persons from acquiring it and to reactiviate petitioner's business in competition with them in the drill steel and drill bit repair business, (2) their questions as to any liability they *347 might have to petitioner because of opening Amco to compete with it, (3) their sentimental attachment to petitioner, and (4) the fact that Gardner-Denver for which Amco was the sales agent preferred that Amco not engage in the repair of drill steel and drill bits. The evidence in this case does not support a conclusion that any of these four claimed purposes for the acquisition of petitioner's stock by Ross and Cowan were in fact the purpose of their acquisition of that stock. At the time Ross and Cowan purchased the stock, their company, Amco, had all the business of repairing drill steel and drill bits in their operating area. Ross and Cowan had to an appreciable extent taken this business away from petitioner. It is therefore apparent that petitioner's name was of no benefit as a competitive factor but rather the names which carried the value in the steel repair business were Ross and Cowan. At the time Ross and Cowan acquired petitioner's stock, it had been 4 i/2 years since their company, Amco, started competing with petitioner and there had been no intimation of any liability on their part because of such competition or that petitioner or anyone connected with petitioner considered *348 them to be liable to petitioner in any way for their competition. That Ross and Cowan had any sentiment for petitioner 5 years after they had left it and started a competing business is equally as unrealistic. In fact the tenor of the testimony would indicate that Ross and Cowan had no sentimental attachment to petitioner. For example, Cowan referred to its being "almost laughable at times" to see some of petitioner's office help standing at the window of petitioner's place of business and watching the truck of one of petitioner's customers stop at the Ross-Cowan place of business across the street. Finally, the evidence is clear that Ross and Cowan had no intention of discontinuing Amco's repair business irrespective of any wishes of representatives of Gardner-Denver. The testimony indicates that it was Ross and Cowan personally who were encouraged by Gardner-Denver to leave the steel repair business and not Amco as an entitly. [7] The record is also clear that Ross and Cowan did not intend to discontinue working in the steel repair business. If the problem had been the fact that the corporate entity Amco was carrying on a steel repair business, Ross and Cowan could have organized *349 a new corporation to operate that business. None of petitioner's claimed purposes for the purchase by Ross and Cowan of petitioner's stock is shown by this record to in fact be a credible purpose and the only purpose which is indicated by this record for the purchase was to obtain the loss carryovers. Petitioner argues that Ross and Cowan did not know the extent of the losses of petitioner until they acquired petitioner's stock. While they may not have known the exact amount of these losses until they acquired the stock, the record shows that they were creditors of petitioner and as such unquestionably knew from the information obtained from the bankruptcy case that petitioner's losses *350 were substantial. Also, the record is clear that throughout their consideration of the purchase of petitioner's stock Ross and Cowan had legal advice and therefore were in a position to be advised of the tax advantage of the loss carryovers. The evidence in this record supports respondent's position that the principal purpose of the acquisition of petitioner's stock by Ross and Cowan was to obtain petitioner's loss carryovers to offset against profits from the business Ross and Cowan had been operating in Amco and transferred 235 to petitioner in order to utilize the loss carryovers. Not only does the evidence support respondent's determination but so does the presumption of section 269(c), [8] which provides that an acquisition for a consideration which is substantially disproportionate to the aggregate of the value of the assets received plus the value of the tax benefit acquired is prima facie evidence of the principal purpose of avoiding Federal income tax described in section 269(a). Substantially all of petitioner's assets had already been sold to Ross-Cowan for use in Amco when the plans of Ross and Cowan to purchase petitioner's stock were consummated. The consideration *351 for petitioner's stock was a cancellation by Ross and Cowan of the balance of $7,632.09 of their note of petitioner which was guaranteed by Hazel. The record does not show the fair market value of the note. The facts, however, support the conclusion that its value would not have been the face value. Notes are commonly discounted based on the length of term remaining and the fact that the note here involved contained no acceleration clause to protect the holder would also adversely affect its value. The deficiencies for the 3 years here in issue resulting from disallowance of the loss carryovers amount to a total of $13,831.76. Based on these facts, there is a substantial disporportionate purchase price of petitioner's stock, making it prima facie that petitioner was acquired for the prescribed purpose. *352 Petitioner's evidence and reasons in no way rebut the presumption that the purchase of petitioner's stock by Ross and Cowan was for the principal purpose of the avoidance of Federal income tax by obtaining loss carryovers to which they would not otherwise be entitled. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. Ross-Cowan originally purchased the bulk of petitioner's inventory, supplies and equipment. It is not clear how Amco acquired them. Both Ross-Cowan and Amco are owned equally by Ross, Cowan and Mecham.↩
3. The record is not clear as to how Ross and Cowan acquired the premises.↩
4. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in Its Trade or Business. - (1) In general. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years. (2) Description of person or persons. - The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such person shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock. (3) Attribution of ownership. - Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein. (4) Definition of purchase. - For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3).↩
5. Sec. 1.382(a)-1(h)(6), Income Tax. Regs.
A corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock if the corporation is not carrying on an active trade or business at the time of such increase in ownership. Thus, if the corporation is inactive at the time of such an increase and subsequently is reactivated in the same line of business as that originally conducted, the corporation has not continued to carry on a trade or business substantially the same as that conducted before such increase in stock ownership. This subparagraph may be illustrated by the following examples: EXAMPLE (1). X Corporation is engaged in the business of manufacturing and selling machinery. On January 1, 1958, the corporation suspends its manufacturing activities and begins to reduce its inventory of finished products because of general adverse business conditions and lack of profits. During the period between January 1 and September 1, 1958, the business of the corporation remains dormant. On September 1, 1958, A, an individual, purchases at least 50 percent in value of X Corporation's outstanding stock. On October 1, 1958, the corporation begins to manufacture the same type of machinery it manufactured before January 1, 1958. The reactivation of the corporation in the same line of business as that conducted before January 1, 1958, does not constitute the carrying on of a trade or business substantially the same as that conducted before the increase in stock ownership. EXAMPLE (2). Y Corporation is engaged in the business of manufacturing machinery. On January 1, 1958, the corporation suspends its manufacturing activities because of a fire which disrupts the operation of its plant. During the period between January 1 and June 1, 1958, substantial efforts are made to reactivate the business of the corporation by reconstructing the damaged plant. On June 1, 1958, A, an individual, purchases at least 50 percent in value of Y Corporation's outstanding stock. On July 1, 1958, the corporation resumes its normal manufacturing activities. The fact that the corporation's normal activities are temporarily suspended at the time of the increase in ownership does not of itself constitute a failure to carry on a trade or business substantially the same as that conducted before the increase in stock ownership.↩
6. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩
7. Cowan testified as follows: Well, they [Gardner-Denver] were encouraging us to get rid of it because they felt like the major part of our effort should be in the sale of their equipment, and they also felt that if we would sell their particular product, their steel business, that we could still be in that business. But we were reluctant to do so because the steel business was - I guess we still had a sentimental attachment to it. We got started in it and we wanted to stay with it.↩
8. Sec. 269(c) Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.↩