**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**BARCLAY JEWELRY, INC., Respondent.**

**No. 6747.**

United States Court of Appeals
First Circuit.

Oct. 19, 1966.

---

Richard C. Pugh, Atty., Dept. of Justice, with whom Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson, Gilbert E. Andrews and Robert A. Bernstein, Attys., Dept. of Justice, were on brief, for petitioner.

James R. McGowan, Providence, R. I., with whom Lester H. Salter and Salter & McGowan, Providence, R. I., were on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This petition by the Commissioner to review a decision of the Tax Court involves a carryover loss deduction taken against the 1960 income of a corporate taxpayer. In 1958 all of the stock of two corporations, Barclay Company and respondent taxpayer Barclay Jewelry, Inc., was owned by one Rice. Barclay Company was a manufacturer of costume jewelry. Taxpayer was its principal customer. Taxpayer, as a wholesaler, sold through manufacturers' representatives on a commission basis, and neither owned nor leased any real or personal property, other than its stock in trade, and had no employees. Its business activities were carried on by Rice from Barclay Company's premises.

In March 1958, persons whom we shall call S & S bought all of the stock of Barclay Company for a substantial sum for the purpose of taking over its manufacturing business and adding it to their own. This transaction had no tax overtones. Rice insisted on selling the stock of taxpayer as well, and, in fact, S & S wanted to buy it. Their purpose was "to avoid having an existing corporation of a similar name owned by other persons which might become a competitor of Barclay Company." S & S paid $10 for all of the stock of taxpayer.[1] S & S thereafter sold the Barclay products through their existing agency, which took over taxpayer's customers insofar

---

1. The Tax Court found that taxpayer was not purchased with the primary purpose of acquiring the loss. 1954 I.R.C. § 269 (a). It adverted to the possibility that it was reactivated, however, for that purpose. Since in 1960 taxpayer possessed nothing but a name, and good will which had largely been taken over by S & S's pre-existing selling company, it may be difficult to visualize any other purpose. We need not, and do not, reach this issue and the questions which it might raise.

as they were retainable, viz., some 90%, using, to some extent, the Barclay name. Although taxpayer's corporate existence was continued, it did no business, and attempted none. In January 1960 taxpayer was reactivated to sell jewelry as before. During that year it showed a profit, to which it sought to apply the operating loss shown on its books in 1958.

■ The statute, as we read it, states that if there is a specified change in corporate ownership, a change which the S & S purchase effected, during the taxable year or the prior taxable year, the corporation shall not have the benefit of carryover losses in such taxable year and *subsequent taxable years* unless it has continued to carry on substantially the same business as that conducted before the acquisition.[2] (Ital. ours) Under this reading taxpayer is foreclosed. The Tax Court found that in 1958 S & S

"had no immediate plan for the petitioner. They instructed their ac-

countant to file whatever reports were required to keep the petitioner active as a corporation. They loaned $200 to the petitioner for incidental expenses and had the petitioner invest $102 in the stock of Beaumode Jewelry, another corporation. The petitioner filed income tax returns for 1958 and 1959."

Filing reports and returns is not doing business. United States v. Fenix & Scisson, Inc., 10 Cir., 1966, 360 F.2d 260. If buying stock was doing business, it was not taxpayer's former business. Even though we disregard this as *de minimis*, it is clear that during 1958, following the purchase, and during 1959, taxpayer did not continue to carry on the business it was engaged in before. Consequently, under our reading of the statute, for all subsequent years the deduction was unavailable.

Rather than addressing itself to the statutory requirement of continuing to carry on the business,[3] the Tax Court

2. Sec. 382. Special limitations on net operating loss carryovers

(a) Purchase of a corporation and change in its trade or business.—

(1) In general.—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

3. The Tax Court referred to its opinions in H. F. Ramsey Company, Inc., 1965, 43 T.C. 500, and Clarksdale Rubber Company, 1965, 45 T.C. 234. Without passing on their correctness, we note that these decisions are distinguishable. In each case the Tax Court found that the taxpayer's suspension of activities was compelled by economic circumstances and that at all times it was intended that the business in which it had been engaging would be resumed as soon as conditions permitted. Conceivably, a proper definition of continuation in business would not proscribe a forced suspension of activities. The fact that S & S, already possessing a selling company, did not have any need for taxpayer, or enough business for it to do, was far from such a circumstance.

first considered whether there had been an "abandonment of the corporation as a business entity." Finding no such abandonment, it then made the inquiry whether, during the taxable year 1960, there was a "resumption" of the business. This approach not only avoided an analysis of the statute, but disregarded substantial portions thereof. The statute does not make the nature of the business during the isolated taxable year the sole condition.

▇▇▇ Taxpayer argues that the Commissioner's, and our, reading is an "excessively literal meaning" of the statute. We, of course, recognize the principle that statutes are not necessarily to be read as intending what they say on their face. However, there is a burden upon a party to show some reason for a departure. This burden has not been met. Taxpayer points to the fact that the legislative history shows great concern with whether there is a *change* in the business. See, e. g., H.Rep.No.1337, 83d Cong., 2d Sess., 41, 42 (1954), U.S. Code Cong. & Admin.News 1954, p. 4025. No doubt this was the primary concern. Ordinarily a gain against which the loss can be taken is not realized unless some business is carried on. Congress did not want the loss to be applicable if it was incurred by a different business. A change in business may, however, be in the temporal rather than the qualitative dimension. We do not think it was either unreasonable, or an inadvertence, that the statute requires both that the nature of the business not be changed and that operations continue despite the change in ownership. On the contrary, the general purpose of this type of deduction dictates both of these requirements.

In Newmarket Mfg. Co. v. United States, 1 Cir., 1956, 233 F.2d 493, cert. den. 353 U.S. 983, 77 S.Ct. 1279, 1 L.Ed. 2d 1142, we observed that carryback losses are "to bring stability to the tax burden." By this we meant that fluctuations which are frozen by the calendar are to a degree unfair, so that it was appropriate to make some attempt to minimize them. In the present statute Congress concededly felt that a loss should carry over only to the extent that it be applied to further income from substantially the same business. It should be even more apparent that the outer limit of fairness is that the loss should benefit the party who suffered it, and not be a windfall to a stranger.

The owners of a corporation which has lost money may not themselves be willing to continue the business, but may be able to sell it to someone who is. If the government allows the purchaser the use of the tax loss, the sellers can charge something therefor, and in that measure recoup. This seems to us, in fact, to be the only reason why a purchaser who was not injured by the loss, having bought after it had been incurred, should be permitted to receive any benefit therefrom.

▇▇ It seems manifest that a purchaser who abandons the business, and has no plans to continue it, is not the sort of purchaser who could be expected to make any payment to the seller on account of an available tax loss. We read the statute as providing that only those persons who purchased with the intention of carrying on the business and using the loss deduction, and who, therefore, presumably, in agreeing on a purchase price, compensated the persons who suffered the loss, can obtain the deduction. Rather than place upon the Commissioner the burden of proving the purchaser's subjective intent at the time of the purchase, Congress required the purchaser to demonstrate his intent by actually continuing the business. This we find reasonable rather than, as implicit in taxpayer's argument, unreasonable. The fact that the recorded legislative history contains no discussion of the problem does not mean that we should ignore clear statutory language which covers it.

The decision of the Tax Court must be reversed and the action remanded for further proceedings not inconsistent herewith.