**COAST QUALITY CONSTRUCTION CORPORATION and Subsidiaries, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 71-2624.**

United States Court of Appeals, Fifth Circuit.

July 11, 1972.

Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., Charles G. Barnett, Atty. Tax Division, Dept. of Justice, Dallas, Tex., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Jr., Meyer Rothwacks, Atty., Carleton D. Powell, Harry Baum, Tax Div., Dept. of Justice, Washington, D. C., Fred B. Ugast, Acting Asst. Atty. Gen., for defendant-appellant.

A. J. Schmitt, Jr., of Beard, Blue, Schmitt & Treen, New Orleans, La., for plaintiffs-appellees.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

GODBOLD, Circuit Judge:

Two noted commentators have forecast that applying the "substantially the same trade or business" requirement of § 382(a) (1) (C) of the Internal Revenue Code would present problems that would "be difficult to resolve in practice" and would "practically insure a high level of uncertainty." B. Bittker & J. Eustice, Federal Income Taxation of Corporations & Shareholders § 16.22, at 16–53 (3d ed. 1971). This appeal evidences the accuracy of the forecast. The District Court, in a trial without a jury, concluded that § 382(a) did not proscribe the corporate taxpayer's inclusion of net operating loss carryover in its tax computations for the years in question,

D.C., 325 F.Supp. 500, and entered judgment accordingly. From this adverse judgment the United States appeals. We affirm.

The basic facts are not in dispute. Charles Kornman owned and operated in the New Orleans area four functionally related corporations, all engaged in some aspect of the purchase, development, and sale of residential property. Kornman Realty held a real estate brokerage license. Quality Realty Company purchased land and held title. Sunrise Homes, Inc. engaged primarily in the sale of developed property. Coast Quality Construction Company (hereinafter "Old Coast" to distinguish it from taxpayer) constructed homes. Thus, Quality Realty acquired unimproved real estate, developed and subdivided it and, as demand required, transferred lots to Sunrise Homes. Sunrise Homes contracted with Old Coast to build houses on the lots and sold the finished residential unit. Kornman also owned a 24 percent interest in Bayou Villa Estates, Inc., which was organized in 1960 to develop a tract of land located 30 miles from New Orleans across Lake Pontchartrain and known as Riverwood. A few lots there were improved and houses built on them and sold. By 1963, however, development and sales in Riverwood had virtually ceased, and the land was being held for future development.

In order to increase borrowing power and financial standing, Kornman, his brother, and four of their friends, all of whom controlled one or more corporations active in similar businesses in different geographic areas, arranged to transfer their stock in each such corporation to a non-operating corporation named Tremont in exchange for approximately one-sixth of the Tremont stock per participant. Pursuant to this arrangement Kornman relinquished his stock in Quality Realty, Sunrise Homes, Old Coast, and Bayou Villa for Tremont stock. By the date of exchange, November 30, 1962, Bayou Villa alone had sustained net operating losses of $154,-000 since its formation.

Ten months later the four corporations previously controlled by Kornman (Quality Realty, Sunrise Homes, Old Coast and Bayou Villa) were merged into a Tremont subsidiary then known as Sunrise Dale, and the name of the corporation resulting from the merger was changed to Coast Quality Construction Corporation (hereinafter Coast Quality) in order to capitalize on the reputation, good will, and credit line of the former Kornman enterprise similarly named. Coast Quality is the taxpayer-plaintiff in this suit. By the date of the merger Bayou Villa's net operating loss had increased to $258,000.

Later in 1963 and during the early part of 1964 Kornman became dissatisfied with Tremont's policies and initiated negotiations for the withdrawal of his interest. On May 5, 1964 he formally offered to exchange his Tremont stock for the stock in Coast Quality, with Coast Quality to retain all property it then owned in Louisiana. The other Tremont shareholders, having personally endorsed a first mortgage on Riverwood, refused to risk their personal liability on Kornman's sole control of the property. An arrangement was worked out whereby on May 14, 1964 Riverwood was transferred to another Tremont subsidiary in exchange for Tremont's assumption of outstanding first and second mortgages on Riverwood and some intercompany accounts owed by Coast Quality, and on May 15, 1964 Tremont exchanged its Coast Quality stock for Kornman's interest in Tremont.

During the entire parent-subsidiary relationship between Tremont and Kornman-controlled corporations, Kornman remained president, a director, and full-time manager of each of the enterprises he had controlled. Until the merger into Coast Quality, each corporation retained its separate identity and operated essentially as a division of Tremont. Riverwood constituted 44 percent of the total value of Coast Quality's assets immediately prior to May 14. The principal assets remaining on the date of Kornman's acquisition consisted of ap-

proximately 125 lots in a New Orleans subdivision and a 22-acre tract zoned for apartments. Coast Quality continued negotiations for purchase of new properties that had begun before the change of ownership. Some, but not all, resulted in acquisitions. That land as well as the land owned on May 15 was developed in the customary manner. In 1966 Tremont went into receivership, and subsequently Kornman personally bought Riverwood.

On May 15, 1964 Coast Quality had accrued net operating loss carryovers totaling $288,178, exclusive of the amount useable by Tremont, and $258,876 of this was attributable to net operating losses incurred in connection with Riverwood prior to the 1963 merger that yielded Coast Quality. Coast Quality claimed net operating loss carryover deductions on its tax returns for 1965 and 1966. The Commissioner disallowed the portion attributable to Riverwood on the ground that it was barred by § 382 (a) (1) (C) because after the change in taxpayer's ownership Coast Quality had not continued to carry on substantially the same business as before.

■ The sole issue presented for our consideration is whether the District Court correctly held that Coast Quality continued to carry on a trade or business substantially the same as that conducted before the change in ownership, within the meaning of § 382(a). Before addressing that issue we must determine whether the applicable standard of review is that of Fed.R.Civ.P. 52(a) or one of law.

The distinction between law and fact is in many cases not susceptible to simple resolution. In this instance our judicial vision requires extrinsic aid to discern the line that separates the grey area bordering fact from the equally opaque boundary of law. We turn to the statutes governing net operating loss carryovers and their history and interpretive regulations for guidance. Congress provided in the 1939 Code for net operating loss carryovers and carrybacks

"to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to setoff its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." Libson Shops, Inc. v. Koehler, 353 U.S. 382, 386, 77 S.Ct. 990, 1 L.Ed.2d 924, 928 (1957). To prevent abuse of this exception from general tax accounting rules there existed only a provision (now § 269) which disallowed net operating loss carryover and carryback deductions where the principal purpose of stock acquisition was tax avoidance. Operation of this limitation depended then, as it does now, on the taxpayer's intent as found by the trier of fact. See, e. g., Scroll, Inc. v. Commissioner of Internal Revenue, 447 F.2d 612 (5th Cir. 1971). In 1954 Congress concluded that the often insurmountable burden of proving the taxpayer's intent to evade taxes rendered § 269's predecessor ineffectual to limit use of the privilege for its intended purpose by prevention of trafficking in net operating loss carryovers. U.S.Code Cong. & Admin. News, 83d Cong. 2d Sess., p. 4067 (1954). Thus, a special limitation embodied in § 382(a) was added as an objective standard to be used along with the subjective test to cull out abuses. Id. at p. 4923. Section 382(a) prohibits a corporate taxpayer from claiming a net operating loss carryover when three conditions occur: "1. At the end of the corporation's taxable year, its ten principal shareholders own a percentage of the corporation's outstanding stock (taken at the total fair market value) that is 50 percentage points or more greater than they owned at the beginning of the same taxable year or at the beginning of the prior taxable year; 2. The increase results from a purchase of stock from an unrelated person or from a decrease in the amount of stock outstanding; and 3. The corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the stock owner-

ship." B. Bittker & J. Eustice, Federal Income Taxation of Corporations & Shareholders, § 16.22, at 16–46 (3d ed. 1971).[1] The regulations direct that "[i]n determining whether a corporation has not continued to carry on a trade or business substantially the same as that con-ducted before any increase in the owner-ship of its stock, all the facts and cir-cumstances of the particular case shall be taken into account" and lists a num-ber of relevant factors. Treas.Reg. § 1.382–3(h) (5).[2] Because the ultimate fact upon which hangs disallowance of a

1. The full text of § 382(a) provides:

"(a) Purchase of a corporation and change in its trade or business.—

"(1) In general.—If, at the end of a taxable year of a corporation—

"(A) any one or more of those per-sons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percent-age points more than such person or persons owned at—

"(i) the beginning of such taxable year, or

"(ii) the beginning of the prior tax-able year,

"(B) the increase in percentage points at the end of such taxable year is at-tributable to—

"(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

"(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation own-ing stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

"(C) such corporation has not con-tinued to carry on a trade or business substantially the same as that con-ducted before any change in the per-centage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss de-duction for such taxable year and sub-sequent taxable years.

"(2) Description of person or persons.—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same per-centage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in para-graph (3), such persons shall be con-sidered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest per-centage of the fair market value of such outstanding stock."

"(3) Attribution of ownership.—Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that sec-tions 318(a) (2) (C) and 318(a) (3) (C) shall be applied without regard to the 50 percent limitation contained therein.

"(4) Definition of purchase.—For pur-poses of this subsection, the term "pur-chase" means the acquisition of stock, the basis of which is determined sole-ly by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3)."

Issue is joined here only on whether the condition described by subsection (1) (C) exists.

2. In its entirety Treas.Reg. § 1.382(a)-1(h) (5) states:

"(5) In determining whether a corpora-tion has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the partic-ular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corpora-tion's employees, plant, equipment, prod-uct, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 382 (a) to disallow net operating loss carry-overs where there is a purchase of the stock of a corporation and its loss carry-overs are used to offset gains of a busi-ness unrelated to that which produced

deduction depends in turn on subsidiary facts that vary widely from case to case, Coast Quality maintains that we are required to arm the District Court's conclusion with the protection of Rule 52 (a). The Sixth Circuit has accepted this position in Euclid-Tennessee, Inc. v. Commissioner of Internal Revenue, 352 F.2d 991 (6th Cir. 1965), cert. denied, 384 U.S. 940, 86 S.Ct. 1456, 16 L.Ed.2d 538 (1966), and Commissioner of Internal Revenue v. Goodwyn Crockery Co., 315 F.2d 110 (6th Cir. 1963), citing Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), and Rudolph v. United States, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484 (1962). We consider the Sixth Circuit's reliance on *Duberstein* and *Rudolph* misplaced. The Court held in those cases only that when taxability turns on intent—a subjective state of mind—the clearly erroneous standard of review applies to the factfinder's conclusion on ultimate fact because

> [d]ecision of the issue presented in these cases must be based ultimately on the application of the factfinding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be

given to the conclusions of the trier of fact.

Commissioner of Internal Revenue v. Duberstein, 363 U.S. at 289, 80 S.Ct. at 1199, 4 L.Ed.2d at 1227.[3] Intent was not an issue in the Sixth Circuit cases and is not part of this case.

■ The Court in *Duberstein* did add, however, the pregnant suggestion that "[i]f there is fear of undue uncertainty or overmuch litigation, Congress may make more precise its treatment of the matter by singling out certain factors and making them determinative of the matter. . . ." 363 U.S. at 290, 80 S.Ct. at 1199, 4 L.Ed.2d at 1227. By setting this counterpoise for its conclusion that what constituted a gift for purposes of gross income computation was a question of fact, the Court clearly implied that a more precise Congressional standard would transform the issue into one of law. Congress, in its consideration of § 382 as a supplement to § 269's predecessor and as necessary for the efficient policing of net operating loss carryover deductions, noted with dissatisfaction that "[the predecessor of § 269] has also been so uncertain in its effect as to place a premium on litigation and a damper on valid business transactions." U.S.Code Cong. & Admin.News, 83d Cong.2d Sess., p. 4067 (1954). The enactment of § 382(a) was the adoption of just such a precise, objective standard as was suggested later in *Duberstein* as a Congressional remedy to bring stability into another tax field, and the enactment was made on the basis of the same fearsome uncertainty the possible eventuality of which prompted the court in *Duberstein*

the losses. However, the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph."

3. Accordingly, we have held that disallowance of net operating loss carryover pursuant to the tax avoidance statute, IRC § 269, is a fact determination that will stand unless clearly erroneous. See, e. g., Scroll, Inc. v. Commissioner of Internal Revenue, *supra.* Similar considerations influenced our determination that the deductibility of amounts as "ordinary and necessary" business expenses is a question of fact. Patterson v. Thomas, 289 F.2d 108 (5th Cir.), cert. denied, 368 U.S. 837, 82 S.Ct. 35, 7 L.Ed.2d 38 (1961).

to extend an invitation to Congress to promulgate more precise standards. Thus, we are compelled to follow the *Duberstein* implication and review the District Court's conclusion as one of law. In so doing, we adhere to the standard of review established in cases similar in the respect that under the statute there in issue or according to settled tax principles subjective motivation or intent was irrelevant. *See* Waterman S.S. Corp. v. Commissioner of Internal Revenue, 430 F.2d 1185, 1192 (5th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); Union Planters Nat'l Bank of Memphis v. United States, 426 F.2d 115 (6th Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970); Berkowitz v. United States, 411 F.2d 818, 821 (5th Cir. 1969).

■■ The government takes the position that § 382(a) (1) (C) is not satisfied by a mere showing that the type of business activities conducted after the change in ownership was substantially the same as before, but that in addition it must be shown that any discontinued activities to which a net operating loss carryover is attributable were related to the ongoing business and did not constitute more than a minor portion of the taxpayer's business prior to the ownership change. Our perusal of the history of § 382(a) and the cases concerning the application of the statute's third requirement in varying factual contexts leaves us in agreement with this statement of the "substantially the same trade or business" requirement. But then it is argued that Riverwood was a distinct division, or certainly more than a minor portion, of Coast Quality's activities and had been discontinued after Kornman gained control.[4] We do not agree.

The original House version of § 382(a) permitted a limited net operating loss carryover deduction where 50 percent or more of the participating interest in a corporation was acquired by new owners. U.S.Code Cong. & Admin.News, 83rd Cong.2d Sess. p. 4067 (1954). The Senate Finance Committee added the "substantially the same trade or business" requirement and proposed the complete elimination of the loss carryover deduction when all three requirements were met, in order to focus the limitation "to those areas in which abuse has most often arisen, that is, the purchase of the stock of a corporation with a history of losses for the purpose of using its loss carryovers to offset gains of a business unrelated to that which produced the losses." *Id.* at p. 4684. The Senate proposal, which became § 382(a) without changes or additions relevant here, provided in effect for an unrebuttable presumption of abusive purpose whenever, after the requisite change in ownership, "the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business. . . ." *Id.* at p. 4924. In short, "Congress did not want the loss to be applicable if it was incurred by a different business." Commissioner of Internal Revenue v. Barclay Jewelry, Inc., 367 F.2d 193, 196 (1st Cir. 1966). This was because a loss resulting from one business endeavor that offsets a profit from another unrelated venture does not effectuate the purpose of the loss carryover deduction to ease the tax burden imposed by annual tax accounting rules on businesses that encounter fluctuations extending beyond the accounting period.

■ Whether a business has changed complexion after a shift in ownership is to be determined by examina-

---

4. The operative change in Coast Quality's business, if there was a change in legal contemplation—the disposal of Riverwood—took place the day before Kornman exchanged his Tremont stock for Coast Quality stock. For tax purposes, however, "[a] change in the trade or business of a corporation made in contemplation of a change in stock ownership will be treated as if such change in trade or business had occurred after such change in stock ownership." Treas. Reg. § 1.382(a)–1(h) (3).

tion for differences in the various factors that characterize a particular endeavor: employees, plant, equipment, product, location, customers. Treas.Reg. § 1.382(a)–1(h) (5) (see note 2, *supra*). *See, e. g.*, Commissioner of Internal Revenue v. Goodwyn Crockery Co., *supra.* The statute clearly contemplates in its use of the word "substantially" a permissible range of contraction of business activities without the loss of the deduction. At the extreme in this direction a business ceases to function permanently. In that instance no deduction is available because "[o]rdinarily a gain against which the loss can be taken is not realized unless some business is carried on." Commissioner of Internal Revenue v. Barclay Jewelry, Inc., *supra*, 367 F.2d at 196. The deduction is lost as well when business is suspended only temporarily either before, *see* S.F.H., Inc. v. Commissioner of Internal Revenue, 444 F.2d 139 (3d Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 234, 30 L.Ed.2d 187 (1971) ; United States v. Fenix & Scisson, Inc., 360 F.2d 260 (10th Cir. 1966), cert. denied, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599 (1967) ; Euclid-Tennessee, Inc. v. Commissioner of Internal Revenue, *supra;* Glover Packing Co. of Texas v. United States, 328 F.2d 342, 164 Ct.Cl. 572 (1964), or after, *see* Commissioner of Internal Revenue v. Barclay Jewelry, Inc., *supra,* the change in ownership, even when the renewed business is the same type carried on before the suspension, *see* Glover Packing Co. v. United States, *supra.* The thread of justification that runs through the temporary suspension cases is that profits arising from the resuscitated corporation do not fall on the same cyclical curve with losses identifiable

with its former self, because even if the taxpayer cultivates the same customers and employs the same persons in the same location and in the same type business as before it does so as part of a new endeavor. In effect, it has taken its losses, given up, had a change of mind, and begun afresh.[5]

The government concedes, and we agree, that Libson Shops, Inc. v. Koehler, *supra,* concerning the allowance of a net operating loss deduction under provisions of the 1939 Internal Revenue Code does not control our decision.[6] But, we are urged to look to it for aid in distilling the essence of the "substantially the same business" requirement of § 382 (a). In *Libson Shops*, a corporation resulting from a merger of 16 women's apparel retailing corporations and one management corporation, all of which had filed separate returns, sought to carry over and deduct the pre-merger net operating losses of three of its constituent corporations from the post-merger income attributable to the other businesses. The court in *Libson* accepted the government's contention that "the carryover privilege is not available unless there is a continuity of enterprise" and held petitioner "not entitled to a carryover since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses." The regulations interpreting § 382(a), which were not adopted until 1962, incorporated a "continuity of the same business enterprise" test, with obvious reference to *Libson Shops*. *See* Treas.Reg. § 1.382(a)–1(h) (5), *supra* note 2. It might seem, then, that the principles applicable in *Libson Shops* would govern the meaning of the

---

5. Our analysis of the suspension cases is consistent with an exception carved out by the Tax Court in Clarksdale Rubber Co., 45 T.C. 234 (1965) and H. F. Ramsey Co., 43 T.C. 500 (1965). In those cases where business was suspended because of economic circumstances and at all times it was intended that business would resume when conditions permitted, and it did in fact resume eventually, the court held the loss carryover deductions not barred by § 382(a). The taxpayers never fully divorced themselves from one endeavor. But see Treas. Reg. 1.382(a)–1 (h) (6), examples 1 & 2.

6. See United States v. Adkins–Phelps, Inc., 400 F.2d 737 (8th Cir. 1968) ; Frederick Steel Co. v. Commissioner of Internal Revenue, 375 F.2d 351 (6th Cir.), cert. denied, 389 U.S. 901, 88 S.Ct. 219, 19 L.Ed.2d 217 (1967) ; Maxwell Hardware v. Commissioner of Internal Revenue, 343 F.2d 713 (9th Cir. 1965).

§ 382(a) (1) (C) requirement. We resist such a suggestion, finding ourselves in agreement with the Tax Court's analysis in several recent cases applying § 382 (a):

It seems to us that what the Supreme Court had in mind in *Libson Shops, Inc.* was something more in the nature of an economic concept prohibiting separate business units from combining so that profits from one separate enterprise might be offset against the losses of another.

Humacid Co., 42 T.C. 894, 907 (1964).

The *Libson Shops* decision did not construe the phrase "same business" to mean the same type of business, indicating an identity or similarity of economic endeavor. *Humacid Co., supra.* But it is clear from the legislative history that section 382(a) (1) (C) does require such identity or substantial similarity of economic endeavor. Since the phrase "same business" in *Libson Shops* does not mean the same thing as it does under section 382, the application of *Libson Shops* to the facts of this case would render section 382 meaningless. In the light of its legislative history, we think the purpose behind the enactment of section 382 was not the same as the rationale used in *Libson Shops*.

Clarksdale Rubber Co., 45 T.C. 234, 244 (1965).

With this background in mind, we turn to the appellant's contentions which, upon careful analysis, resolve into a strained argument that Coast Quality after the change in its ownership discontinued all or a sufficient part of a business with the consequence that it failed to qualify for the loss carryover deduction. Clearly taxpayer was at all times involved in the residential real estate development business.[7] Much like any functionally integrated enterprise that buys raw material, processes and then sells it, Coast Quality purchased land, subdivided it and arranged for facilities necessary for suitable development, constructed houses on the lots it prepared, and sold the finished product. As a tract of land, Riverwood was essential to the furtherance of Coast Quality's purpose, but no more so than any other tract. We recognize that land desirable for residential development is not fungible to the extent that inventory assets may be substitutable in the operation of a different type enterprise, crude petroleum in a gasoline refinery for example, so that a land developer's replacement in its operations of one parcel of property with another could lead to the conclusion that it was no longer engaged in the same endeavor. But that general observation finds no application here. Riverwood had no characteristics to distinguish it from other Coast Quality tracts suitable for the same type of development with appeal to a similar range of customers and in the same general locale. It employed approximately the same number of persons as were occupied in other Coast Quality developments, and employees in corresponding positions performed identical functions regardless of the tract with which they were associated. Finally, Riverwood was subject in common with other Coast Quality tracts to a particular method of operations, with allowances for adjustments to tailor standard procedure to the specific development. Given the same ownership of all such tracts, we are persuaded by this combination of factors that Riverwood did not constitute a separate business in the sense intended by § 382 (a) (1) (C) of a distinct economic endeavor identifiable by objective char-

7. Compare with the instant case Euclid-Tennessee, Inc. v. Commissioner of Internal Revenue, *supra* (taxpayer operated as a brewery before change in ownership and sold and serviced heavy construction equipment afterwards) ; Mill Ridge Coal Co. v. Patterson, 264 F.2d 713 (5th Cir.), cert. denied, 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63 (1959) (taxpayer engaged in coal mining before change in ownership and oil transportation business afterwards) ; The Clare Co., 28 TCM 1348 (1969) (taxpayer derived its profits before change in ownership primarily from construction business and only secondarily from rental of construction equipment and afterwards, primarily from rental of barges).

acteristics like customers, employees, location, and product.

 The government maintains that in any event the disposal of Riverwood, constituting 44 percent of Coast Quality's assets, amounted to the discontinuance of "more than a minor portion of [Coast Quality's] business" within the meaning of Treas.Reg. § 1.382(a)–1(h) (7). That regulation explains that a corporation which has discontinued more than a minor portion of its business carried on before the change in ownership has not satisfied the requirements for a deduction. It further states that "[i]n determining whether the discontinued activities are more than 'minor' for purposes of the preceding sentence consideration shall be given to whether the discontinuance of the activities has the effect of utilizing loss carry-overs to offset gains of a business unrelated to that which produced the losses." Were the facts of this case otherwise, and, for example, Coast Quality had suspended land acquisition and sale of finished homes and instead had made its services available to others as a contractor for the subdivision and development of their land, then the Internal Revenue Service's examples [8] make clear that this regulation would be applicable. But, as we mentioned earlier, after the change in ownership Coast Quality continued to acquire new land for development. Furthermore, implicit in the government's position that § 1.382(a)–1(h) (7) governs the outcome is the notion that prior to its sale Riverwood was unrelated to the overall business of Coast Quality. We are thus asked to hold that losses follow an asset and may not be carried over in an economic endeavor that has not altered materially and in which that type asset is an integral part. We are unpersuaded that under the circumstances found here either a literal reading of § 382(a) or the motivating rationale that we discern from the scanty legislative history requires our acceptance of the loss-follows-asset theory.

Affirmed.

---

8. "Example (1). X Corporation, a calendar-year taxpayer, is engaged in three separate businesses, A, B, and C. Approximately one-half of X Corporation's total business activities (measured in terms of capital invested, gross income, size of payroll, and similar factors) relates to business A, 30 percent to business B, and the remaining 20 percent to business C. On December 31, 1957, X Corporation had substantial net operating loss carryovers all of which are attributable to the operation of business C. On June 1, 1958, Y Corporation purchases at least 50 percent in value of X Corporation's outstanding stock and during 1959 X Corporation discontinues business C. As of December 31, 1959, X Corporation has not continued to carry on substantially the same trade or business as that conducted prior to the increase in ownership.

"Example (2) Assume the same facts as in example (1), except that all of X Corporation's net operating loss carryovers are attributable to business A and that the capital released by the discontinuance of business C is used to revitalize business A. Since the discontinuance of business C does not result in the utilization of net operating losses attributable to one business to offset gains of a business unrelated to that which produced the losses, the discontinuance of such business does not of itself constitute the failure to carry on substantially the same trade or business as that conducted prior to the increase in ownership."

Treas.Reg. 1.382(a)–1(h) (7).