SIX SEAM COMPANY, INC., Plaintiff-Appellee (73–2169), Plaintiff-Cross-Appellant (73–2170),

v.

UNITED STATES of America, Defendant-Appellant (73–2169), Defendant-Cross-Appellee (73–2170).

Nos. 73–2169, 73–2170.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 12, 1975.

Decided Oct. 17, 1975.

As Amended Nov. 6, 1975.

George J. Long, U. S. Atty., Louisville, Ky., Scott P. Crampton, Meyer Rothwacks, Ernest J. Brown, Gilbert Andrews, Richard Perkins, Stephen M. Gelber, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant in No. 73–2169 and defendant-cross-appellee in No. 73–2170.

James E. Shafer, Wood, Pedley, Stansbury, Rice & Warner, Charles F. Wood, Louisville, Ky., for plaintiff-appellee in No. 73–2169 and plaintiff-cross-appellant in No. 73–2170.

Before EDWARDS and ENGEL, Circuit Judges, and RUBIN, District Judge [*].

ENGEL, Circuit Judge.

This suit was commenced in the district court by Six Seam Co., for a refund of federal corporate income taxes for the years 1963, 1964 and 1965. Six Seam appeals from a district court grant of summary judgment in favor of the government denying it the right to deduct certain net operating losses incurred in the fiscal years 1960 and 1961, from its profits in 1963 and 1964. In its cross-appeal, the government challenges the district court's holding that the sale of certain mining equipment from Coiltown Mining Company to taxpayer Six Seam was a bona fide sale and that, therefore, Six Seam upon disposition of the assets to a third party, was not required under Section 1245 of the Internal Revenue Code to restore to its income the depreciation which Coiltown had claimed prior to the date of sale.

Six Seam was incorporated in 1959 and until April, 1961, its business consisted solely of operating a tipple used in the preparation of coal for commercial sale. The tipple crushed, sorted and washed coal. At no time during this period did Six Seam itself engage in the business of actually mining coal. Rather, it purchased raw coal from various local mines and merely processed the coal through its tipple. The coal tipple itself was leased by Six Seam from a third party, the Kington family. Taxpayer incurred net operating losses of $73,017 and $24,437 during fiscal years of 1960 and 1961 respectively. In March, 1961, Six Seam, heavily in debt, ceased operating the tipple. In April, 1961 it sub-leased the use of the tipple to one of its suppliers, Walnut Grove Mining. Initially, Six Seam had attempted to sell the tipple rights to Walnut Grove, but the latter was not in a position to purchase the facility. The sub-lease to Walnut Grove was not exclusive since Six Seam reserved the opportunity to process any of its coal through the tipple. The record indicates that Six Seam never subsequently availed itself of this reserved right. When Six Seam executed the lease, it notified various governmental agencies that it was terminating its business.

The Board of Directors of Six Seam on March 20, 1961, authorized the acceptance for surrender and cancellation of the stock of any shareholder who desired to tender his shares to the corporation. The resolution provided no consideration for the surrendered shares, but relieved the shareholder of his personal guarantee on a $75,000 note executed by Six Seam to a Kentucky bank. In May, 1961, the shareholders of Six Seam agreed to sell their stock to Coiltown Mining Company, Inc. for a total of $100 plus the full assumption by the latter of Six Seam's corporate liabilities. Coiltown was a coal mining company which for many years had been engaged in extracting coal from the Klondike Mine in Kentucky under contracts for the sale of coal to the Tennessee Valley Authority. During the remainder of 1961 and throughout 1962, Six Seam, now a wholly owned subsidiary of Coiltown, did not engage in any active business except to receive rental income from the lease of the tipple to Walnut Grove.

In 1961 and prior years Coiltown had encountered increasing difficulty in completing a coal supply contract with the Tennessee Valley Authority. The share-

[*] The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

holders were concerned that potential liabilities in contractual damages would be incurred by the corporation if Coiltown defaulted on its contract with TVA. Since Coiltown had been accumulating liquid reserves in preparation for liquidation of the corporation and distribution to the shareholders, the specific fear was that a large contractual liability would deplete the "nest egg" of over $1,000,000 in cash and marketable securities. Therefore, to insulate the liquid assets of Coiltown from potentially ruinous liability on the TVA contract, the shareholders of Coiltown decided, as found by the district court,

". . . to reactivate Six Seam, a wholly-owned, but dormant, subsidiary of Coiltown, and endeavor to persuade TVA to substitute it for Coiltown on the T-4 Contract and to release Coiltown and the surety on its $325,000.00 performance bond from that contract . . . .

"The plan adopted and authorized by the Coiltown directors at a special meeting held on February 19, 1963, was for Coiltown to purchase for cash additional Six Seam stock 'in an amount sufficient to allow that company . . . to be able to perform the TVA contract' and 'thereby induce TVA to release Coiltown Mining Company from its contract' . . . . This plan also contemplated that Six Seam would purchase all of Coiltown's mining assets at a fair price with the cash thus received and that Six Seam would pay all of its outstanding obligations and have enough cash working capital left over to commence mining operations, thereby enabling Six Seam to present a balance sheet showing a net worth sufficient to satisfy both TVA and the bonding company that would be needed to write the necessary $325,000 performance bond on Six Seam in favor of TVA."

Pursuant to the plan, Six Seam on April 1, 1963, issued and Coiltown purchased an additional 3,030 shares of Six Seam stock for $303,000. On the same date Six Seam purchased all of Coiltown's mining equipment for $145,000 and all of its mining supplies for $41,291. Out of the remaining cash, Six Seam paid all of its outstanding debts and obligations, including an account payable to Coiltown of $66,000. When these transactions were completed, Six Seam owned all of Coiltown's mining assets and in addition had approximately $50,000 working capital to begin mining operations. Concerning this transaction, the district court found that

"The sole purpose and intent underlying the transfer by Coiltown of its mining and other operating assets to Six Seam on April 1, 1963, was to enable Coiltown's shareholders to get out of the coal mining business at the minimum possible risk of loss. And that those assets were not transferred to Six Seam pursuant to any plan to reorganize Coiltown so that its shareholders could continue in the coal mining business in modified corporate form to Six Seam. . . . Similarly, there is credible testimony in the record, which is not inherently improbable and which is not disputed or contradicted, that the $145,000 Six Seam paid to Coiltown for its mining equipment and other depreciable assets was a fair price, inasmuch as the sale was for cash and the assets were to remain in place. . . . Accordingly, this court finds as a fact that the sale by Coiltown of its mining and other depreciable assets to Six Seam on April 1, 1963, was a bona fide sale of those assets and, for the reasons heretofore given, was made for the legitimate purpose of protecting Coiltown's liquid assets in the event of a default on the T-4 contract . . . ."

By September 1964, the earlier production difficulties had been resolved and Six Seam was able successfully to complete performance under the TVA contract. Six Seam subsequently leased the mining equipment it had obtained from Coiltown to Pyro Mining Company. Pyro exercised the option under the lease and in January, 1965, purchased the mining equipment for $320,000.

I. The Loss Carryover

On its 1963 corporate income tax return, Six Seam claimed a net operating loss deduction of $48,219 against its mining income from the TVA contract, leaving a balance of $53,316 in loss carryover which it claimed as a net operating loss deduction on its 1964 return. The Commissioner of Internal Revenue disallowed the net operating losses for both 1963 and 1964 pursuant to Sections 269 and 382(a) of the Internal Revenue Code of 1954. In the district court, summary judgment was rendered in favor of the government on the ground that the deductions were disallowed by Section 382(a).[1] The court did not pass upon the Section 269 issue.

Section 172 of the Internal Revenue Code of 1954, 26 U.S.C. § 172, in providing for the carryover of net operating losses in a given tax year to offset income which may be earned later, is the current statutory expression of a Congressional belief that "the allowance of a net operating business loss carry-over will greatly aid business and stimulate new enterprises". H.R.Rep. No. 855, 76th Cong. 1st Sess. 9. While its decisional authority may have been superseded by the 1954 amendments to the Internal Revenue Code, the following observation in *Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386, 77 S.Ct. 990, 993, 1 L.Ed.2d 924 (1957), still has validity:

"Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year."

Prior to the 1954 amendments to the Internal Revenue Code, the only statuto-

1. Section 382(a) provides:

(1) In general—If, at the end of a taxable year of a corporation—

(A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

(i) the beginning of such taxable year, or

(ii) the beginning of the prior taxable year,

(B) the increase in percentage points at the end of such taxable year is attributable to—

(i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

(ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

(2) Description of person or persons.—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock.

(3) Attribution of ownership.—Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein.

(4) Definition of purchase.—For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3).

ry vehicle to avoid potential abuse of the loss carryover provision was found in Section 269 which authorized the Commissioner of Internal Revenue to disallow a deduction, credit or allowance not otherwise available, in cases where the control of a corporation was acquired principally for the purpose of tax evasion and avoidance. The effectiveness of this provision, however, was impaired by difficulty in establishing whether, in a given case, tax avoidance was the principal purpose of the acquisition. This led to the enactment of Section 382 which had the dual purpose of avoiding abuse of the carryover provisions "through trafficking in corporations with operating loss carryovers, the tax benefits of which are exploited by persons other than those who incurred the loss" while at the same time providing an "objective standard governing the availability of a major tax benefit". U.S.Code Cong. & Admin.News, 1954, Vol. 3, page 4067. (House Report No. 1337). See generally, *Maxwell Hardware Co. v. C.I.R.*, 343 F.2d 713 (9th Cir. 1965).

Section 382(a) provides that if at the end of a taxable year of a corporation there has been a 50 percentage point change of stock ownership in relation to the beginning of the taxable year or the prior taxable year, then the net operating loss carryovers, if any, from prior taxable years of the corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction; *provided* that the corporation "has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock". Taxpayer concedes that the requisite percentage change of ownership has occurred. The only point of contention is whether there has been a change in taxpayer's business, or a break in continuity of business activity.

■ As a preliminary matter, we reject the government's argument that a change of taxpayer's business compels disallowance because Six Seam's assumption of the TVA contract and entry into the mining business was substantially different from the business of operating the coal tipple. Assuming that the two operations are sufficiently dissimilar to constitute a change of business within the meaning of § 382(a), the government's argument nevertheless fails to consider the time frame of the statute. The change of ownership occurred in May 1961. The alleged change of business, however, did not occur until April of 1963. In *Frederick Steel Co. v. C.I.R.*, 375 F.2d 351, 354 (6th Cir. 1967), *cert. denied* 389 U.S. 901, 88 S.Ct. 219, 19 L.Ed.2d 217 we held:

> Section 382 of the 1954 Code, insofar as here applicable, provides for disallowance of net operating loss carryovers when two factors occur—when there has been both a 50% change in value of stock ownership, and a change in the nature of the business.
>
> Both factors—change of nature of the business and change in ownership—are determined at the close of the taxable year for which benefit of the deduction is sought; and the *change of ownership* is measured by comparison with the beginning of that taxable year or by prior taxable year, or (by virtue of Section 394(b) of the 1954 Code) June 22, 1954, whichever occurs later; and the *change of business*, by comparison with the business carried on prior to the change of ownership.
>
> In the instant case there was, then, a change in the nature of the business; but the second factor is lacking—a change in the ownership of the business within the period specified in the statute. Accordingly, under the provisions of Section 382, the net operating loss carry-over is not here to be disallowed to petitioner.

Thus at the end of the 1963 taxable year of Six Seam (June 30), the year in which the deduction was sought, while the alleged change of business may have occurred, the requisite change of ownership had not occurred in either the 1963 taxable year or the prior taxable year.

Under the government's theory, the disallowance provisions of § 382(a) are not applicable.

■ If this were the sole issue, we might be obliged to reverse. There exists, however, another basis for disallowing the deductions. Treasury Regulation 1.382(a)–(1)(h)(6) provides that the net operating loss deduction is disallowed "if the corporation is not carrying on an active trade or business at the time of such increase in ownership". The regulation is based on the implicit requirement of the statute that not only should the business after the stock ownership change be substantially similar to the business before the change, but that also the corporation has *continued* to carry on a business. The statute "seems to convey the idea of continuous operation, without any substantial break. It hardly envisages the resumption of an operation carried on in the distant past, with intervening operations of a different kind. Nor does it envisage the resuscitation of a business long since discontinued". *Glover Packing Co. v. United States*, 328 F.2d 342, 348, 164 Ct.Cl. 572 (1964). "We do not think it was either unreasonable, or an inadvertence, that the statute requires both that the nature of the business not be changed and that operations continue despite the change in ownership. On the contrary, the general purpose of this type of deduction dictates both of these requirements". *C.I.R. v. Barclay Jewelry, Inc.*, 367 F.2d 193, 196 (1st Cir. 1966).

■ Thus the question becomes what degree of activity is necessary to sustain the characterization "active trade or business". In this light it should be noted that even a corporation in the process of formal liquidation will to some degree be engaged in business since the cessation of business activities necessarily involves a period of time. That a corporation may be earning income on its assets is not by itself determinative of whether it is engaged in an active business. We believe that the correct standard in determining whether such limited activity amounts to continuing a trade or business under the statute is whether it evidences only an intent to wind up corporate affairs, or whether instead the company is simply maintaining a low profile with an intention to resume operations should the business climate improve.

"In the case at bar there was not a mere temporary suspension of operations. It was a discontinuance of them, without any firm purpose to resume them in the future . . . When the Rath Company decided it did not want to buy plaintiff's property or to buy the stockholders' shares, the stockholders gave up, and charged off their stock as worthless. This was evidence of an *intention* to abandon the enterprise as hopeless."

*Glover Packing Co., supra*, at 348 (emphasis added)

In *United States v. Fenix and Scisson, Inc.*, 360 F.2d 260, 267, 268 (10th Cir. 1966), *cert. denied*, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599, the court, in deciding whether the acquired corporation was engaged in an active business, observed:

Certainly the fact that the company was incurring some fixed expenses and filing tax returns doesn't mean it engaged in a trade or business. The expenses for the most part were to preserve the remaining equipment until it would be disposed of. As for the rentals and equipment sales, we find nowhere an argument made that Oronogo was engaged in the business of equipment sales and rentals. At any rate such an argument would carry little weight for the company was not maintaining an inventory for such purpose by replacing the equipment sold and rented. Furthermore, there is no doubt that at one time it held out between eighty and ninety per cent of its equipment, excluding trucks, for sale to the public.

\* \* \* \* \* \*

In any event, Oronogo's attempt to sell nearly all of its equipment is incompatible with the idea that it was merely standing by intending to re-

sume operations should business factors improve. Had they been completely successful in selling equipment, they would have been unable to resume operations short of repurchasing necessary equipment.

██ The intent standard is consistent with the two Tax Court cases Six Seam cites as supporting its position that a forced suspension from business due to economic conditions does not violate the continuity-of-business requirements. We agree with the Fifth Circuit in *Coast Quality Construction Corp. v. United States,* 463 F.2d 503, 510 (n.5) (5th Cir. 1972), that "our analysis of the suspension cases is consistent with an exception carved out by the Tax Court in *Clarksdale Rubber Co.,* 45 T.C. 234 (1965) and *H. F. Ramsey Co.,* 43 T.C. 500 (1965). In those cases where business was suspended because of economic circumstances and at all times it was intended that business would resume when conditions permitted, and it did in fact resume eventually, the court held the loss carryover deductions not barred by § 382(a). The taxpayers never fully divorced themselves from one endeavor."

From the undisputed evidence in the record, Six Seam at the time of change of ownership had suspended its active business operations with the intention of winding up its corporate existence. It had ceased operation of its only physical

asset and had leased it to a third party. The redemption and sale of Six Seam stock at a nominal price is "evidence of an intention to abandon the enterprise as hopeless . . . ," *Glover Packing Co., supra.* As in *Fenix, supra,* the attempt by Six Seam to sell its sole asset, the coal tipple, "is incompatible with the idea that it was merely standing by intending to resume operations should business factors improve". Finally, the record indicates Six Seam informed the Division of Unemployment Insurance of Kentucky of its transfer of the coal processing tipple to Walnut Grove on April 1, 1961, and in answer to the question "Type of business retained" filed in the form "None". Similar notice was given to the Internal Revenue Service. Other than the collection of rentals, Six Seam was not engaged in any corporate activity from March or April of 1961 until April 1, 1963 when the coal mining assets were transferred. Even receipt of rentals ceased in late 1963.

Accordingly, we agree with the determination of the district court that the provisions of Section 382(a) compel the disallowance of the net operating loss deductions, and affirm the judgment of the district court in this respect.[2]

## II. Recapture of Depreciation

The government in its appeal contends that Six Seam is required to restore to

2. In addition to citing regulation 1.382(a)-(1)(h)(6), the district judge relied on *Euclid-Tennessee, Inc. v. Commissioner,* 352 F.2d 991 (6th Cir. 1965), *cert. denied,* 384 U.S. 940, 86 S.Ct. 1456, 16 L.Ed.2d 538, as authority for the proposition that "the holding of rental property is not a trade or business within the meaning of Section 382(a)(1)(C)". We read neither Section 382 nor *Euclid* so broadly, although we do note that Treas.Reg. 1.382(a)-(1)(h)(4) provides that:

"[4] For purposes of this paragraph, the holding purchase or sale for *investment* purposes of stock, securities, or similar property shall not be considered a trade or business unless such activities historically have constituted the primary activities of the corporation." (emphasis added).

In disallowing the carryover of net operating losses in *Euclid-Tennessee, Inc.,* supra, we held "that the post-merger renting and holding of what was the old brewery real estate as an

insignificant incident to taxpayer's whole purpose was not the carrying on of 'a trade or business substantially the same as that conducted [by the brewery] before the [the merger]', i. e. holding and renting its remnant assets awaiting complete liquidation . . ." at 994. In the next sentence, we intimated our doubts whether in the first instance the "Gerst Brewing Company's holding and renting of its remnant assets constituted 'a trade or business' ", but in any event found that unnecessary to decide since the change of business was sufficient to deny the deduction. We believe that this suggested alternative holding does not imply that renting real estate is automatically within the prohibition of Reg. 1.382(a)-(1)(h)(4) without any regard to investment purposes. Rather that language is more easily subsumed within the inactive business rule of Reg. 1.382(a)-(1)(h)(6) as explained in this opinion.

its income, under § 1245 of the Code, the depreciation Coiltown claimed prior to April 1, 1963 on the mining assets Coiltown sold to Six Seam and which were later sold to Pyro Mining Company. The district court granted judgment to the taxpayer on this issue on a finding that the transfer of the mining assets to Six Seam constituted a bona fide sale.

Section 1245 requires that a taxpayer, upon the sale of specified depreciable property, must recognize as ordinary income that portion of its gain which represents prior deductions for depreciation. Six Seam concedes that it must restore to its income prior depreciation deductions; however, it argues, that only those depreciation deductions that it itself had incurred are properly added to the adjusted basis to calculate the recomputed basis. The government argues that Section 1245(a)(2) provides that the recomputed basis shall be calculated by adding those depreciation deductions which are ". . . *reflected* in such adjusted basis on account of deductions . . . allowed or allowable to the taxpayer or to *any other person* for depreciation . . . ." 26 U.S.C. § 1245(a)(2) (emphasis added). The government's next step is to assert that the transfer of the mining assets to Six Seam constituted a transfer of property to a controlled corporation and consequently the transferor's (Coiltown's) basis is assumed by Six Seam. Therefore Six Seam's basis "reflects" the prior depreciation deductions taken by Coiltown. The issue is thus whether Six Seam assumed Coiltown's basis in the mining assets. Six Seam and the district court rely on the argument that that transfer of the assets constituted a bona fide sale and consequently Six Seam's basis in such assets is the sale price.

The government, in its attempt to prove a tax-free transaction, alleged that the transaction between Six Seam was a tax-free reorganization within the meaning of 26 U.S.C. § 368(a)(1)(D). The district court rejected this argument finding that the facts indicated a complete liquidation. This finding is not disputed on appeal. The government's other contention in district court is that the transaction between Six Seam and Coiltown was subject to the dictates of Section 351 which provides that:

"No gain or loss shall be recognized if property is transferred to a corporation . . . by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation."

If the transaction is within Section 351, then the provisions of Section 362 automatically apply to require the assumption of the transferor's basis. The transferred basis would trigger the recapture provisions of Section 1245.

■ The intent of Section 351 is to allow a taxpayer or group of taxpayers to rearrange the structure of a business without incurring tax costs. Without Section 351, if a proprietor of a business decided to incorporate, the paper transfer of the business assets from the ownership of the proprietor to the new corporation would result in taxation of the difference of the fair market value of the assets over the adjusted basis. Congress believed that a mere change of form of ownership without the relinquishment of control of the property was insignificant to justify taxation.

"There is, in short, a transfer in form only, a technical transfer not one of substance. The section is designed to give present tax relief for internal rearrangements of the taxpayer's own assets, accompanied by no sacrifice of control and no real generation of income for the owner—and to defer taxation until a true outside disposition is made."

*DuPont v. United States*, 471 F.2d 1211, 1214 (Ct.Cl.1973).

The operation of Section 351 is mandatory when a transfer of property to a controlled corporation occurs. "No gain or loss *shall* be recognized . . . ." Thus if a transaction is within the scope

of Section 351, taxable gain is postponed and the basis remains the same.

 If Coiltown had contributed the mining assets to Six Seam's capital structure in exchange for 3,030 shares the literal provisions of Section 351 would have been invoked, since there would be a transfer of property to a corporation solely in exchange for stock in such corporation. Since Coiltown controlled Six Seam as a wholly owned subsidiary, the only question is whether the transfer of cash to Six Seam for stock and its return on the same day to Coiltown for the mining equipment should have a different tax consequence. Without the cash infusion by Coiltown, Six Seam would have been unable to "purchase" the mining equipment. The capital contribution to Six Seam and the "sale" occurred on the same day. In short, the two steps constituted an integrated plan. In apparent agreement are the district court's own findings (see pages 349–350 *supra*). Under such circumstances we are compelled to hold that even "though the form of the subject transaction was that of a sale, it is clear that substance, not form, controls in determining the effect of the transaction for federal income tax purposes." *Stanley, Inc. v. Schuster*, 295 F.Supp. 812, 815 (S.D.Ohio 1969), *aff'd per curiam*, 421 F.2d 1360 (6th Cir. 1970); *cert. denied* 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 51.

 The district court did not address itself to the question of whether Section 351 was applicable, but rather made a finding that the price paid for the mining assets was reasonable and consequently the sale was bona fide. However, the reasonableness of the price paid for property transferred to a controlled corporation is irrelevant. If a transaction is within the scope of Section 351, Section 362 mandates that the basis shall remain the same without regard to the fair price of the property. Nor do we consider ourselves bound by the district court determination since "this case

hinges . . . on the legal characterization, for federal income tax purposes, of the transactions between the parties. That characterization is not a question of fact, but rather one of law". *Union Planters National Bank v. United States*, 426 F.2d 115, 117 (6th Cir. 1970), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56. Therefore since the basis of the mining equipment in Six Seam's hands reflected the prior depreciation deductions incurred by Coiltown, Six Seam must under Section 1245 recoup such deductions as ordinary income.

## III. Settlement Issue

A further dispute between the parties is whether the district judge was obliged to incorporate in the final judgment the provisions of a purported settlement reached between Six Seam and the government. According to the government the alleged agreement conforms to a letter addressed to the Tax Division of the Department of Justice on January 31, 1973 and signed by S. Russell Smith, counsel for Six Seam. We note, however, no formal entry of a stipulation. The government argues that the result of this agreement was a concession by the taxpayer of additional deficiencies pertaining to the tax years of 1963 and 1964, which would have been offset against any refund which might ultimately have been determined due by the district court for 1965. The judgment initially entered on June 27, 1973, provided that pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, the government should file a counter-claim within ten days after entry of judgment "properly setting forth its claim to recover plaintiff's income tax deficiencies for 1963 and 1964 (which said amounts had been netted against the plaintiff's refunds set forth in paragraph I above)." Thereafter counsel for the taxpayer Six Seam moved the court to enter an order amending the June 27 judgment so as to delete any provision for a counter-claim, it being alleged that the government failed to file the counter-claim within the time specified. This motion was al-

lowed and on September 4, 1973, the district court entered an "amended and substituted judgment" providing for the refund in accordance with its previously entered opinion, but without allowance of the setoff claimed by the government. The government claims that a counter-claim was not possible since the prerequisite assessments were barred by the statute of limitations, and that in any event a settlement agreement is binding on the parties and should be enforced by the court without regard to formal claims and counter-claims.

■ Counsel for Six Seam asserts in response that this question is not properly before us since the district court made no determination and was never requested to determine (1) whether a settlement agreement was reached between the parties; (2) what the terms of such an agreement were; (3) whether the terms had been followed. Six Seam claims that such questions are factual and should be determined in the first instance by the district court. We agree. We are unable upon the record before us to determine the truth of the matter, or whether, in fact, any agreement was ever reached between the parties. Since this case must in any event be remanded to the district court, it therefore seems appropriate that we decline to decide the question raised by the government, leaving the district court free to reconsider the issue. However, should the district court find that there was no settlement agreement between the parties, then it will be necessary for the district court to reconsider the unlitigated issues intended to be covered by the agreement since it appears that the court inadvertently adopted part of the agreement insofar as concessions were made by the government to the taxpayer.

Lastly, as urged by the government, the district court should dispose of the still pending government motion to amend the judgments in the ten cases involving questions of shareholder tax liability which were consolidated in the district court, but not appealed to this court for lack of a final order.

Affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.